The DENVER FOUNDATION, Petitioner.

v.

WELLS FARGO BANK, N.A., Respondent.

No. 05SC849.

Supreme Court of Colorado, En Banc.

July 2, 2007.

Rehearing Denied Aug. 13, 2007.*

---

* Justice Rice, Justice Coats and Justice Eid would grant the Petition.

Sherman & Howard L.L.C., Christopher Lane, Bridget K. Sullivan, Denver, Colorado, Attorneys for Petitioner.

Baker & Hostetler LLP, Marc D. Flink, Casie D. Collignon, Denver, Colorado, Attorneys for Respondent.

Davis Graham & Stubbs LLP, Ted R. Sikora II, Victoria V. Johnson, Denver, Colorado, Attorneys for Amici Curiae Colorado Bankers Association; JPMorgan Chase Bank, N.A.; Valley Bank and Trust; Home State Bank; and First National Bank.

Chief Justice MULLARKEY delivered the Opinion of the Court.

Charles Sterne and Dorothy Elder Sterne created a charitable trust bequeathing, upon their deaths, a portion of their estate for the uses and purposes of The Denver Foundation, a philanthropic community trust, to be held in trust by the United Bank of Denver. After the Sternes passed away, The Denver Foundation requested Wells Fargo Bank, successor trustee to the United Bank of Denver, to transfer the Sternes' trust principal to The Denver Foundation's nonprofit corporation to hold for management and investment. Wells Fargo refused, claiming the Sternes' trust document prohibited such a transfer. The Denver probate court granted summary judgment in favor of The Denver Foundation, but in *Denver Foundation v. Wells Fargo Bank, N.A.*, 140 P.3d 78 (Colo.App.2005), the court of appeals reversed that judgment. We now reverse the court of appeals' decision, holding that the Sternes' trust instrument does not forbid the transfer of the trust principal to The Denver Foundation's nonprofit corporation and, indeed, that the

Sternes' intent in establishing the trust would be best effectuated by such a transfer.

## I. Facts and Procedural History

In 1925, Denver community leaders created The Denver Foundation (also "the Foundation"), which was designed to serve the charitable, educational, and benevolent needs of the greater Denver area in perpetuity. The Denver Foundation was envisioned as an organization that would "afford an opportunity alike to persons of wealth and persons of moderate means to make their several gifts to different trustees of their own selection" while meeting "the changing needs for such gifts with flexibility in the power of distribution." To govern the organization, the creators of The Denver Foundation ratified a Declaration of Trust ("1925 Declaration") establishing the Foundation and describing its charitable purposes.

As envisioned in 1925, trust settlors were to make their gifts to trustee banks, which would hold the principal in trust and then disburse the yearly income on the principal to The Denver Foundation. In turn, The Denver Foundation would distribute a portion of that income to various community "beneficiaries" identified and selected by an impartial and changing committee knowledgeable about the charitable needs of the time. The Foundation would then reinvest the remainder in the Foundation's endowment, which is comprised of several component funds subject to separate accounting and community recognition.

From its inception as a community trust,[1] The Denver Foundation has enjoyed expansive powers not generally accorded to traditional beneficiaries. For instance, The Denver Foundation's 1925 Declaration ensured it was free to modify restrictions in trust gifts that had ceased to serve the best interests of the Foundation's charitable beneficiaries.[2] That Declaration also granted the Foundation the power to direct transfers of income and principal[3] and to conclusively construe, if in good faith, any provision contained in the Declaration.[4]

Drawn to the Foundation's mission and unique structure for charitable giving, Charles Sterne, a long-time Denver philanthropist, created a trust in 1976 for the uses and purposes of The Denver Foundation, naming United Bank of Denver (predecessor to Wells Fargo Bank, N.A.) as trustee. In 1978, Dorothy Elder Sterne, his wife, created a similar trust (the two trusts are henceforth referred to as "the Sterne–Elder Trust" or "the Trust"). The Sterne–Elder Trust provided that upon the Sternes' deaths, the principal of the Trust should be held by the United Bank of Denver, and The Denver Foundation would receive and then distribute the income from the principal to various charities. The Sternes intended their gift as a permanent endowment. Section 2(c)(3)(d) of the Sterne–Elder Trust agreement provided that "[n]either The Denver Foundation nor its Distribution Committee is authorized to direct disbursement of principal, or invade the principal, of such Trust." The Sterne–Elder Trust incorporated by reference the

---

1. A community trust is a type of charitable trust described as a union of many gifts contributed by the people of a particular community as endowments for the charitable benefit of the community. George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 329 (rev.2d ed. 1992) (*"Bogert on Trusts"*). A community trust is administered by independent and representative members of the community, and it makes most of its grants to charitable organizations within that geographically defined community. *Id.*

2. Article II of the 1925 Declaration allows the Foundation to deviate from an instrument containing any gift if circumstances have so changed "as to render unnecessary, undesirable, impractical or impossible a literal compliance" with its terms.

3. Article IV(4) of the 1925 Declaration provides, in part, that "the Trustees shall pay and disburse such portions of the net income or of the principal of the property held by them respectively, at such times and in such amounts as shall from time to time be ordered or directed by the Distribution Committee...."

4. Article XI states, "The maker of any gift, grant, devise or bequest for the uses and purposes herein expressed ... shall be conclusively deemed to have agreed that the Trustees' Committee may ... construe any provision of this resolution and declaration, which construction and action thereunder in good faith shall be conclusive."

Foundation's Declaration of Trust, along with any future amendments to the Declaration.[5]

The Denver Foundation made a significant change to its structure in 1983. Until 1983, the Foundation could not directly hold and manage endowment funds; settlors were required to make gifts to trustee banks, which would hold the funds for the uses and purposes of the Foundation. In 1983, however, the Foundation established a nonprofit corporation capable of carrying out the same functions that had theretofore been performed by trustee banks—holding and investing trust principal as the Foundation's permanent endowment. Once the Foundation's nonprofit corporation was organized, the corporation assumed the role of the common governing body of the Foundation, and each trust held by the corporation for the uses and purposes of the Foundation was to be treated by the Internal Revenue Service as a "component part" of the Foundation. Since 1983, most settlors have chosen to make their gifts directly to the corporation, streamlining the charitable giving process by eliminating the middle-man trustee banks, although settlors are still free to give a gift to be held in trust by a participating trustee bank.

In 1997, The Denver Foundation adopted an Amended and Restated Declaration of Trust ("1997 Declaration"), the operative document governing the Foundation and its activities at present. The 1997 Declaration continues to allow for alternative plans, administered either by the corporation or by trustees of settlors' own selection.[6] All gifts, however, are governed by the 1997 Declaration, which contains many of the same types of provisions as those in the 1925 Declaration. For instance, the 1997 Declaration provides, in Article 2–3, a broad power to modify designations and restrictions on the "use or distribution of funds." Article 3–1.1, titled "Transfer of Funds to Corporation," mandates that "[e]ach Trustee Bank shall, within ten days after the last day of each calendar quarter, pay and disburse to the Corporation such portion of the net income and principal of each trust held by it hereunder as the Board of Trustees shall direct." Article 7–8.3 reiterates The Denver Foundation's power to conclusively construe the Foundation's Declaration,[7] and Article 7–8.5 allows the Foundation to "[a]mend any of the terms or provisions of this Declaration ... provided, however, that no change shall be made to this Declaration of Trust that modifies, enlarges, or restricts the powers, duties or liabilities of any Trustee Bank."

Around the same time The Denver Foundation adopted the 1997 Declaration, it also reviewed the management of its endowment funds, including those component parts of its endowment held and managed by trustee banks. Based on that review, the Foundation determined that it could better serve the charitable needs of its community beneficiaries if it centralized management of its endowment in its nonprofit corporation.[8] Accordingly, the Foundation requested its trustee banks transfer the principal of component trusts to the Foundation to be held by the corporation as part of its endowment.

As part of this movement toward centralization, when Dorothy Elder Sterne passed away in 2003 the Foundation requested Wells Fargo Bank, N.A. ("Wells Fargo") transfer the Sterne–Elder Trust principal to the Foundation to be held by the Foundation's nonprofit corporation. Wells Fargo refused, however,[9] and the Foundation instituted this

5. Section 2(c)(3)(d) states, "THE DENVER FOUNDATION, as established by that certain resolution and declaration of trust ... and amendments thereto ... is hereby adopted as part of this Trust Agreement as if herein incorporated."

6. "Donations may be made either to the Corporation referred to in Section 1–1.2 or in trust to one of the participating Trustee Banks...." 1997 Declaration Art. 1–1.1.

7. "The Board of Trustees may ... take any of the following actions ... Construe in good faith any term or provision of this Declaration of Trust, which construction shall be conclusive."

8. The Denver Foundation concluded it was and continues to be positioned advantageously to invest the principal of the Sterne–Elder Trust because it has access to investment vehicles only available to foundations or to entities capable of investing large sums.

9. In a last effort to compel Wells Fargo to hand over the Sterne–Elder Trust principal, The Denver Foundation passed a Resolution in February

litigation in the Denver probate court to compel Wells Fargo to transfer the principal.

On motion for summary judgment, the Denver probate court determined that the 1976 Trust Agreement, read in conjunction with the 1997 Declaration, granted the Foundation the power to direct Wells Fargo to transfer the Sterne–Elder Trust principal to the Foundation's nonprofit corporation. First, the probate court held that the Sternes clearly intended to incorporate future amendments of the Declaration into their 1976 Trust Agreement. In so doing, the court read the invasion of principal provision in the 1976 Trust Agreement as merely preventing the Foundation from distributing the principal to outside, end-user charities. It also noted the various versions of the Foundation's Declaration and, by extension, the 1976 Trust Agreement provided that the parties agreed the Foundation could amend provisions of its Declaration in any respect consistent with the original purposes of the Foundation. Second, the probate court held that the Foundation's Declaration, as conclusively construed in good faith by the Foundation, empowers the Foundation to compel the transfer of principal to its nonprofit corporation. Finally, the Probate Court struck as irrelevant any evidence relating to comparative rates of return on investments as between Wells Fargo and The Denver Foundation. It did, however, allow evidence of other transfers of trust principal to The Denver Foundation approved by Wells Fargo.

The court of appeals reversed the probate court's decision, ruling that the Foundation could not lawfully direct Wells Fargo to transfer the Trust principal to the Foundation. *Denver Found.*, 140 P.3d at 86. The Sternes' intent, it said, was to create a perpetual trust managed by a bank trustee for the benefit of the Foundation in a standard tripartite relationship, and the doctrine of cy pres or equitable deviation could not be relied upon to modify the trust in this instance. *Id.* at 82. Nor could Article 3–1.1 compel the transfer of principal, concluded the appellate panel, as the provision applied only to funds available to The Denver Foundation, which included the Trust's income but not its principal. *Id.* at 85. The appeals court also deemed invalid Article 7–8.3 of the 1997 Declaration, which confers exclusive authority on The Denver Foundation to conclusively construe its Declaration, reasoning a provision granting one party authority to conclusively construe a contract was tantamount to "unfettered discretion" that was void as against public policy. *Id.* at 83. Moreover, the panel speculated that the transfer of principal to the Foundation would terminate the Trust because its legal and beneficial interests would merge. *Id.* at 86. Lastly, the panel held that the probate court had abused its discretion in admitting extrinsic evidence concerning Wells Fargo's prior transfers of trust assets. *Id.* at 80–81.

We now review these arguments and reverse the court of appeals' construction of the 1976 Trust Agreement, although we affirm its ruling on the evidentiary issue.[10] We

---

2004 which purported to amend or eliminate all provisions of the Sterne–Elder Trust that would preclude Wells Fargo from transferring the trust assets to The Denver Foundation's community endowment, specifically Section 2(c)(3)(d) of the Sterne–Elder Trust. We need not address this Resolution or the Foundation's power to adopt and enforce it, as it plays no part in our construction of the Trust.

10. We granted certiorari on the following issues:
   1. Whether the prohibition in the Sterne–Elder Trust on invasion of principal precludes a transfer of the principal of that component Trust of the Foundation from Wells Fargo to the Foundation's nonprofit corporation to be held as a part of the Foundation's permanent endowment.
   2. Whether the court of appeals committed error when it imposed its own construction of

the Foundation's Declaration without showing that the Foundation's construction was in bad faith or an abuse of discretion.
   3. Whether the Sterne–Elder Trust gives The Denver Foundation power to modify a restriction on distribution that is inconsistent with the charitable needs of the community. Is the Foundation's exercise of that power limited to circumstances that the restriction would make it impossible, illegal or impractical to fulfill the purposes of the Trust.
   4. Whether the transfer of the principal of the Sterne–Elder Trust to the Foundation's nonprofit corporation as a permanent endowment would cause a merger of all legal and equitable interests in the Trust that would terminate the Trust.
   5. Whether it was proper for the Probate Court to consider evidence on the evolution of the Foundation and on prior Wells Fargo

conclude the Sternes' intent was to establish a perpetual gift and a permanent endowment for the uses and purposes of the Foundation, limited only by the provisions contained in the 1976 Trust Agreement and the 1997 Declaration when read together.[11]

## II. Interpretation of the Sterne–Elder Trust

We are called upon, in this instance, to interpret the Sternes' 1976 Trust Agreement, which incorporates by reference The Denver Foundation's 1925 Declaration and any amendments thereto. Neither party has asserted the Sterne–Elder Trust is ambiguous and, absent ambiguity, interpretation of a trust is a question of law that we review de novo. *In re Ferguson Trusts*, 929 P.2d 33, 35 (Colo.App.1996).

Our objective in construing this trust, as with any other contract or will, is to determine the intent of the settlors. *In re Ferguson Trusts*, 929 P.2d at 35; *Meier v. Denver U.S. Nat'l Bank*, 164 Colo. 25, 29, 431 P.2d 1019, 1021 (1967) ("The cardinal rule in the construction of a Will is that the Court shall determine the actual intent of the testator from the instrument in its entirety and, having ascertained that intent, shall carry it out, provided that the testator's intent conforms to law and public policy."). Thus, paramount to our concerns is the Sternes' fundamental purposes in executing the 1976 Trust Agreement.

To ascertain this intent, we read and interpret all the various documents at issue, as a whole, to give effect to the Sternes' wishes in establishing the Trust. § 15–11–510, C.R.S. (2006) ("A writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification."); *U.S. Nat'l Bank v. Brunton*, 112 Colo. 442, 448, 150 P.2d 297, 299 (1944); *In re Estate of Daigle*, 642 P.2d 527, 528 (Colo. App.1982) (finding settlor's intent is dis-

cerned from entire instrument); 11 Richard A. Lord, *Williston on Contracts* § 30.25 (4th ed.1999) (explaining that a document incorporated into a contract should be construed as a single instrument). Likewise, we construe the Trust instruments in their entirety to harmonize and give effect to all the provisions, rendering none meaningless or superfluous. *U.S. Fid. & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo.1992); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984); *U.S. Nat'l Bank*, 112 Colo. at 448, 150 P.2d at 299. Finally, we also consider relevant circumstances in effect at the time the 1976 Trust Agreement was executed to understand and find meaning in the instrument. *Powder Horn Constructors, Inc. v. City of Florence*, 754 P.2d 356, 368 (Colo.1988); *Bd. of County Comm'rs v. City & County of Denver*, 40 P.3d 25, 29 (Colo.App.2001).

The Sterne–Elder Trust is created and governed by the terms of two documents: the 1976 Trust Agreement and The Denver Foundation's Declaration of Trust, which is expressly incorporated into the Trust Agreement. The 1976 Trust Agreement categorically forbids The Denver Foundation to "direct disbursement of principal, or invade the principal" of the Trust. The Denver Foundation contends that this language, read in the context of the 1997 Declaration, does not preclude transfer of the Trust corpus from Wells Fargo to The Denver Foundation's nonprofit corporation. In support, it relies primarily on the language contained in Article 3–1.1 of the 1997 Declaration, entitled "Transfer of Funds to Corporation," which provides:

> Each Trustee Bank shall, within ten days after the last day of each calendar quarter, pay and disburse to the Corporation such portion of the net income and principal of each trust held by it hereunder as the Board of Trustees shall direct.

transfers of Foundation component trusts to the corporate entity.

11. In light of our disposition as to Issue 1, whether the prohibition in the Sterne–Elder Trust on invasion of principal precludes a trans-

fer of the Trust's principal to the Foundation's nonprofit corporation, we do not address Issue 3, which deals with The Denver Foundation's power to modify a restriction on distribution.

The Denver Foundation maintains that Article 3–1.1, by its title, authorizes *transfers* of both principal and income to the corporation without regard to restrictions or conditions placed upon those funds. In contrast, Article 3–1.2, which governs distributions of funds, is explicitly made subject to restrictions contained in trust instruments. Reasoning Article 3–1.2 should inform construction of Article 3–1.1, The Denver Foundation concludes that under the 1997 Amended Declaration (as well as pursuant to the earlier 1925 incarnation), its power to direct transfers of funds to the Foundation is not subject to trust restrictions, but its power to distribute money out to end-user charities is clearly subject to the Sternes' prohibition against the invasion of the trust corpus. The Foundation also urges that Article 3–1.1 does not override the Sternes' intent on invasion of principal; rather, it says, when read together and considered on equal footing with the other terms in the 1976 Trust Agreement, Article 3–1.1 embodies the Sternes' wishes of a permanent endowment available to generate income for future generations of beneficiaries.

We agree with The Denver Foundation's interpretation of the 1997 Declaration as permitting the transfer of the Sterne–Elder Trust corpus to its nonprofit corporation for two reasons. First, The Denver Foundation is entitled to conclusively construe, if in good faith, any provision of its Declaration, and we cannot conclude that its interpretation of Article 3–1.1 is either arbitrary or capricious. Second, we conclude that The Denver Foundation's interpretation, which allows for the transfer of the Trust corpus to the Foundation's nonprofit corporation, corresponds with the Sternes' intent and essential purposes in executing their 1976 Trust Agreement.

## A. The Denver Foundation's Power to Conclusively Construe

■■■ The Denver Foundation possesses, under both the 1925 and the 1997 Declarations, the power to conclusively construe in good faith any term or provision of its Declaration. We analyze such discretionary

powers according to an abuse of discretion standard, and we will only interfere when discretion has been exercised arbitrarily or capriciously.[12] *Matter of Brooks' Estate*, 42 Colo.App. 333, 335, 596 P.2d 1220, 1221 (1979); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (according "significant weight" to trustees' interpretation when their construction was to have binding effect under the trust agreement).

■■■ An arbitrary and capricious benchmark restrains the exercise of our independent review and interpretation save for instances of abuse of discretion, bad faith, dishonesty, or arbitrary action. Thus, an interpretation or construction that we ourselves would not have arrived at under de novo review will not necessarily fail. Restatement (Second) of Trusts § 187 cmt. e ("The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power...."); George T. Bogert, *Trusts* § 89 (6th ed. 1987) ("[E]ven if the court would have taken different action or believes that a reasonable man would have come to a contrary conclusion" discretionary decisions will generally not be upset); 33 Charles Alan Wright & Charles H. Koch, Jr., *Federal Practice and Procedure: Judicial Review* § 8334 (2006) ("The arbitrariness standard requires only that the court reach the negative conclusion that the ... decision is not implausible under the circumstances; it need not confirm the decision in any real sense.").

Instead, only in the most egregious of circumstances, in which an interpretation is extraordinarily imprudent, extremely unreasonable, or substantially out of step with the settlor's intent, will we interfere to impose our own reading of the document. *Bogert on Trusts* § 560 (rev.2d ed.1980) (suggesting courts upset the use of discretionary powers only to remedy improper actions such as

12. The court of appeals improperly dismissed Article 7–8.3 as unfettered discretion and thus void against public policy. But this provision contains a good faith limitation and therefore cannot be conceived of as absolute, as it invites judicial review pursuant to this standard.

"acting for the benefit of the [holder of the discretionary power] himself or some third person, or for the purpose of harming the beneficiary or out of ill will or prejudice against him, or an action contrary to the purposes of the trust"); Restatement (Second) of Trusts § 187 cmt. e (determining courts will not intervene unless the discretionary power is wielded dishonestly, or with an improper even though not a dishonest motive, or effects a patently unreasonable judgment).

■ In this case, while we may not have independently construed Article 3–1.1 in the same manner as has The Denver Foundation, we cannot conclude that The Denver Foundation has arbitrarily or capriciously arrived at its interpretation of that language. It is not outside the bounds of reason that Article 3–1.1, by its title, sanctions The Denver Foundation to direct the transfer of trust corpus to the Foundation's nonprofit corporation for administration and investment but not for disbursement to outside end-user charities. So construed, the Foundation's exercise of power under Article 3–1.1 would not conflict with the 1976 Trust Agreement provision barring "inva[sion] of principal." Rather, it would simply reflect the drafters' intent that the Sterne–Elder Trust exist as a permanent endowment fund, the principal of which would never be distributed to end-user charities but instead would exist in perpetuity to benefit the Denver community.[13]

We are also reluctant to meddle with The Denver Foundation's right to construe in good faith the terms of its Declaration because the Sternes, by incorporating into their 1976 Trust Agreement the 1925 Declaration and any later amendments thereto, knowingly and intelligently conferred upon The Denver Foundation that precise power. We have not seen any evidence that would suggest The Denver Foundation seeks to construe its Declaration dishonestly or for improper motives, nor, it should be said, has Wells Fargo alleged any such intention. Indeed, we have no reason to question the good faith of The Denver Foundation. Ultimately, however, we endorse this interpretation of the 1976 Trust agreement because we conclude that transfer of the Sterne–Elder Trust principal to The Denver Foundation furthers the Sternes' overarching intent and essential purpose in creating their Trust.

### B. The Sternes' Intent in Creating the Trust

The Sternes' intent in establishing a trust that "becomes a part of The Denver Foundation"[14] must be read in light of the entire trust instrument—the 1976 Trust Agreement, the 1925 Declaration, and the subsequent 1997 Declaration—as well as the circumstances surrounding the 1976 Trust Agreement's execution. Through that lens, we find the probate court's reading of the Sternes' intent, which broadly holds that the Trust is "a permanent gift for the benefit of the Foundation," is, in our opinion, a sounder interpretation of the Sternes' fundamental goal in establishing the Trust than the court of appeals' narrow reading that the Sternes intended to create a perpetual charitable trust managed by a bank as trustee.

At the outset, it bears repeating that the Sternes chose to bequeath a portion of their estate to The Denver Foundation, a community trust, which is not a traditional trust beneficiary but rather one that exists to develop, hold, and administer endowment gifts—not for itself but for other community charities. As a result, the Sternes granted The Denver Foundation unique powers affording it the flexibility to adapt to changing circumstances in the realm of charitable giving in perpetuity. As discussed above, the Sternes agreed to grant The Denver Foundation broad powers of amendment, modifica-

---

**13.** Consistent with our duty to reach a harmonious construction of various provisions in the Trust instrument that best reflects the Sternes' overriding intent, we interpret the 1976 Trust Agreement interdiction against the "disbursement of principal" as an expression of the Sternes' desire that the Trust principal be kept intact. On the other hand, Article 3–1.1 in the 1997 Declaration instructing trustees to "pay and disburse to the Corporation" principal and income merely provides for the transfer of principal to the Foundation to be kept as a whole, and therefore it does not contravene the Sternes' exhortation not to fragment and scatter the principal to various end-users.

**14.** 1976 Trust Agreement § 2(e).

tion, distribution, and construction, which evince their general wish that The Denver Foundation exercise substantial discretion in the administration of their gift. That the Sternes chose to entrust to The Denver Foundation crucial responsibilities and a wide array of discretionary powers not generally accorded to traditional trust beneficiaries reflects the fact that the usual tripartite trust relationship was of significantly less import to them than the existence of a perpetual trust administered by the Foundation. Accordingly, we cannot read the Sternes' essential purpose in creating the Trust to hinge on the traditional triangulated trust form. Instead, that tripartite form was merely the mechanism by which to achieve their essential purpose in giving the gift.

This conclusion is borne out by the fact that the Sternes could not have designated The Denver Foundation as a trustee at the time of the execution of the Trust Agreement. In 1976, The Denver Foundation did not have a corporate entity capable of holding and administering assets; thus, at that time, a transfer of principal from the Sterne–Elder Trust to The Denver Foundation would have to have been distributed to end-user charities and the permanent endowment would have been lost, in contravention of the Sternes' wishes. Now, given structural changes permitting The Denver Foundation to hold and manage endowments, it is capable of administering the Trust principal as trustee of this permanent endowment without violating the Sternes' most essential purpose—that the Trust "become part of the Denver Foundation."

In light of this overriding purpose and the circumstances existing in 1976 that prevented the Sternes from appointing The Denver Foundation to act as trustee, and given The Denver Foundation's power to conclusively construe its own Declaration in good faith, we conclude that the 1976 Trust Agreement does not restrict The Denver Foundation from directing the transfer of principal to its

nonprofit corporation to be held as part of the permanent endowment of The Denver Foundation community trust.[15]

### III. Termination of the Trust

■ Having determined that the 1976 Trust Agreement does not bar The Denver Foundation from directing a transfer of the Sterne–Elder trust principal to its nonprofit corporation, we turn now to Wells Fargo's assertion that such a transfer would merge all legal and beneficial interests in the Foundation and therefore extinguish the Trust altogether. In light of settled trust law, we reject the notion that the Trust will terminate upon transfer of the principal to The Denver Foundation.

■ When the entire beneficial interest of a trust is held by the same person or entity that holds the entire legal interest, the trust terminates under the doctrine of merger; in other words, if the sole beneficiary also functions as the sole trustee, the trust ceases to exist. IV Austin W. Scott & William F. Fratcher, *Scott on Trusts* § 341 (4th ed.1989); Restatement (Third) of Trusts § 69. But for the doctrine of merger to apply, the legal and beneficial interests must be completely coextensive. *In re Estate of Brenner*, 37 Colo.App. 271, 274, 547 P.2d 938, 942 (1976). Conversely, if other equitable interests remain, the trust will not terminate. *Id.*

■ In the case of a charitable trust, the beneficiary is the unspecified, indefinite general public to whom the social and economic advantages of the trust accrues. Restatement (Second) of Trusts § 364 cmt. a; IVA *Scott on Trusts* § 348 (4th ed.1989); *In re Garrison's Estate*, 391 Pa. 234, 137 A.2d 321 (1958). Instead of identifying a person or corporation as beneficiary, the settlor of a charitable trust must describe a purpose which is of substantial public benefit. *Bogert on Trusts* §§ 362–63 (rev.2d ed. 1992) As a consequence, the responsibility for public su-

15. At oral argument, counsel for The Denver Foundation invited us to make explicit that our ruling in no way authorizes The Denver Foundation to transfer or distribute the corpus of the Sterne–Elder Trust to end-user charities. We accept that invitation and make clear that our

holding goes no further than to read the Trust instruments to permit transfer of the principal to the Foundation's nonprofit corporation. We do not read the Trust instruments to permit or to embody an intent to allow distributions of the principal to end-user charitable organizations.

pervision of charitable trusts traditionally has fallen to the state's Attorney General, who may maintain a suit to compel property to be held for the charitable purpose for which it was given. § 15–1–1005, C.R.S. (2006); § 24–31–101, C.R.S. (2006); *Bogert on Trusts* § 411 (3d ed. 2005) ("The public benefits arising from the charitable trust justify the selection of some public official for its enforcement. Since the Attorney General protects the rights of the people of the state, he has been chosen as the protector, supervisor, and enforcer of charitable trusts...."); Restatement (Second) of Trusts § 391 cmt. a (explaining that Attorney General may sue to enforce proper use of principal and income consistent with terms of charitable gift).

Thus, Wells Fargo's fears of termination are unfounded. First, the 1976 Trust Agreement specifically names two preferred beneficiaries to which The Denver Foundation should distribute income. As such, these organizations have enforceable rights as named income beneficiaries that preclude application of the doctrine of merger. *Matter of Estate of Doan*, 727 P.2d 574, 576 (Okla. 1986) (stating that income beneficiary of bequest to community trust has substantial vested interest in construction of will). Second, because the general public, as represented by the Attorney General, is an indefinite beneficiary with enforceable rights in the charitable trust, the public interest will not merge with that of The Denver Foundation and the trust will remain intact when the corpus of the Trust is transferred for administration to The Denver Foundation. For these reasons, the court of appeals erred in concluding that the merger rule would ultimately terminate the trust if such a transfer were to occur.

## IV. Admissibility of Extrinsic Evidence

■ Finally, we consider briefly an evidentiary issue raised at the probate level, which we review for abuse of discretion. *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo.1994).

In the probate court, Wells Fargo filed a motion in limine to strike an affidavit attesting to the fact that Wells Fargo had acceded to prior Foundation requests to transfer principal of other trusts to the Foundation's corporation. The probate court denied the motion and allowed the evidence, but the court of appeals reversed, holding that the probate court was wrong to have considered the evidence.

■ When the terms of a bequest are unambiguous, it is not permissible for a court to consider extrinsic evidence that casts doubt upon the meaning of the language used and renders such language susceptible to a different meaning. *In re Dewson's Estate*, 181 Colo. 189, 192, 509 P.2d 311, 312 (1973). In other words, intent must be determined from contract language itself, and an unambiguous document cannot be explained by extrinsic evidence so as to dispute its plain meaning. *Fox v. I–10, Ltd.*, 936 P.2d 580, 582 (Colo.App.1996).

■ Neither party claims the terms of the Sterne–Elder Trust are ambiguous. The probate court and the court of appeals concurred, and we see no reason to upset the consensus. As such, extrinsic evidence as to the prior course of performance between The Denver Foundation and Wells Fargo is inadmissible, and the court of appeals was right to overturn the probate court's admission of such evidence. But even absent the rule barring extrinsic evidence to interpret unambiguous documents, we see little, if any, relevance of this evidence to a determination of the Sternes' intent in 1976 as expressed in their Trust instruments. And, as Wells Fargo observes, because the terms of the "other trusts", as well as the facts and circumstances surrounding the transfer of the assets of these other trusts, were not offered by The Denver Foundation, we doubt evidence of the treatment of those trusts would be of appreciable probative value, either. Accordingly, we affirm the court of appeals' decision on this issue.

## V. Conclusion

In this case, we construe the language of the Sternes' 1976 Trust Agreement, which incorporates by reference The Denver Foundation's 1997 Amended Declaration, as allowing Wells Fargo to transfer the Trust principal to The Denver Foundation's nonprofit

corporation to hold for management and investment. In so doing, we are satisfied that the Trust will not terminate upon that transfer. Therefore, we reverse the court of appeals' ultimate conclusion that a transfer of the Trust principal would be inconsistent with the Sternes' intent. However, we affirm the court of appeals' determination that extrinsic evidence as to prior transfers of other trusts' assets from Wells Fargo to The Denver Foundation is not admissible and cannot be considered in evaluating the suitability of summary judgment. We reverse the court of appeals' judgment and remand the case to that court with instructions to return it to the Denver probate court for proceedings consistent with this opinion.

Justice EID dissents, and Justice RICE and Justice COATS join in the dissent.

Justice EID, dissenting.

Contrary to the express terms of the 1976 Trust Agreement, the majority permits The Denver Foundation to transfer the principal of the Sterne–Elder Trust to itself and thereby become trustee over the Trust. The majority arrives at this result based on the fact that the 1976 Trust Agreement incorporates by reference the governing documents of The Denver Foundation, which purportedly give it such authority. In my view, The Denver Foundation cannot contradict the express terms of a trust agreement, and therefore cannot, through the vehicle of incorporation, give itself authority to transfer the principal of the Sterne–Elder Trust and become trustee of the funds. Under the majority's rationale, no provision of a trust instrument is safe from such revision by incorporation. For this reason, I respectfully dissent.

The terms of the 1976 Trust Agreement governing the Sterne–Elder Trust designate the United Bank of Denver (and its successor, Wells Fargo) as the trustee of the Trust and The Denver Foundation as one of its beneficiaries. 1976 Trust Agreement, § 2(c)(3)(d). The 1976 Trust Agreement provides that Wells Fargo is to pay the income from the Trust principal to The Denver Foundation on a periodic basis, which the Foundation will then distribute to various end-user charities. See id.; see also maj. op. at 1119. As the majority recognizes, the Sterne–Elder Trust "categorically forbids," maj. op. at 1122, The Denver Foundation from "direct[ing] disbursement of principal, or invad[ing] the principal" of the Trust. Id.; see also 1976 Trust Agreement, § 2(c)(3)(d). Indeed, I agree with the majority that the terms of the Agreement, including the provision regarding disbursement, are unambiguous. See maj. op. at 1122, 1126.[1]

In this case, The Denver Foundation has ordered Wells Fargo to transfer the principal of the Sterne–Elder Trust to itself, in direct contravention to section 2(c)(3)(d) of the 1976 Trust Agreement. The majority permits this transfer by relying on the fact that the 1976 Trust Agreement incorporates by reference the governing documents of The Denver Foundation, which the Foundation has construed to allow trustee banks, such as Wells Fargo, to be ordered to "disburse" to the Foundation the principal from the trusts for which these banks serve as trustee. See id. at 1124; see also 1997 Declaration, § 3–1.1. In arriving at this result, the majority holds that The Denver Foundation has the power to "conclusively construe, if in good faith" its governing documents, maj. op. at 1123, and that this power necessarily extends to interpretation of the 1976 Trust Agreement's prohibition on disbursement, which the Foundation reads to apply only to disbursement to end-user charities, not disbursement to another trustee such as The Denver Foundation.

The initial flaw in the majority's reasoning is the vast deference it pays to the Foundation's interpretation of a settlor's trust agreement. The Foundation may have the authority to conclusively construe *its own governing documents*, but it does not have such expansive authority over interpretation of *trust instruments* under which it is designated as one of many beneficiaries. The fact that the trust instrument in this case incorporates by reference the governing docu-

---

1. Because the terms of the Agreement are unambiguous, the majority properly finds extrinsic evidence regarding Wells Fargo's prior treatment of distribution orders inadmissible. See maj. op. at 1126.

ments of The Denver Foundation does not change this result. We are asked to interpret the 1976 Trust Agreement; it is the 1997 Declaration that is incorporated therein, not vice versa. The Foundation cannot give itself powers under the 1997 Declaration that, by incorporation, would contradict the plain terms of the 1976 Trust Agreement.

But the majority holds The Denver Foundation can do precisely that. Section 2(c)(3)(d) of the 1976 Trust Agreement prohibits the Foundation from "disbursing" the principal of the Trust—period. Under Article 3–1.1 of the 1997 Declaration, the Foundation is given the power to direct a trustee bank to "disburse" the principal of a trust to the Foundation. After today's decision, the principal of the Sterne–Elder Trust will have been "disbursed." The Foundation's, and hence the majority's, interpretation relies on Article 3–1.2 of the 1997 Declaration, which deals with distributions to end-user charities and "is explicitly made subject to restrictions contained in trust instruments." *Id.* at 1123. The Foundation concludes from this that because Article 3–1.2 is explicitly limited by the trust instrument, Article 3–1.1 must not be. *See id.* at 1123. But again, the 1976 Trust Agreement governs this case. The Denver Foundation is not free to abide by it in some instances and not in others.

But even if the Foundation is correct that the prohibition on disbursement of principal applies only to disbursements made to end-user charities, there is a more fundamental problem in its interpretation. By permitting The Denver Foundation to disburse the trust principal to itself "to hold for management and investment," *id.* at 1118, the Foundation becomes the new trustee of the Sterne–Elder Trust. This arrangement is clearly contrary to the language of the 1976 Trust Agreement, which names the United Bank of Denver (and Wells Fargo as its successor) as trustee. *See* 1976 Trust Agreement, § 2(c)(3)(d).

The majority does not defer to any interpretation proposed by the Foundation to permit the substitution of trustees, as no such interpretation is possible from the words of 1976 Trust Agreement. Instead, the majority concludes that the Sternes were uncon-

cerned with the question of who would serve as trustee so long as the principal of the trust remained held in a permanent endowment. *See* maj. op. at 1124–25. The majority thus dismisses Wells Fargo as "merely the mechanism" for executing the Sternes' "most essential purpose" of establishing a permanent endowment. *Id.* at 1125.

This rationale is problematic both as applied to the facts of this case and to trust law in general. On the facts, there is no indication from the 1976 Trust Agreement that the Sternes did not care whether Wells Fargo served as the trustee. On the contrary, the agreement contains extensive provisions pertaining to succession of trustees in the event that United Bank of Denver ceased to exist. *See* 1976 Trust Agreement, § 3 (stating that following the settlor's inability to serve as trustee, "all rights and powers of the Trustees shall thereupon vest in and thereafter *be exercised only by the corporate Trustee* ...." (emphasis added)); *see also id.* at § 2(c)(3)(d) (stating that if the Foundation is succeeded by another, "the Trustee shall hold the principal" of the Sterne–Elder Memorial Trust...."). These provisions demonstrate that the Sternes carefully and thoughtfully considered the issue of which entity would serve as the trustee of their Trust.

The majority answers that the Sternes could not have designated The Denver Foundation as trustee when they created their Trust because the Foundation was not, at that time, organized to accept such responsibility. *See* maj. op. at 1125. In other words, the majority reasons, had the Sternes been able to designate The Denver Foundation as trustee at the time, they would have. But the Foundation obtained the power to act as a trustee in 1983, and there was nothing preventing the Sternes from selecting the Foundation to serve as trustee after that time. *See* 1976 Trust Agreement, § 3 (giving settlor power to name a successor trustee); *see also* Restatement (Third) of Trusts § 63(1) (2003). Yet, no change was ever made. Finally, as the majority recognizes, settlors such as the Sternes are still permitted under the Foundation's governing documents to give the Foundation a gift to be

held in trust by a trustee bank. *See* maj. op. at 1120. That The Denver Foundation continues to permit such a choice demonstrates the fact that the selection of a trustee is an important one.

In the end, the majority's rationale demonstrates the dangers of elevating a trust's purpose over its language. Under the majority's rationale, The Denver Foundation could, through amendment of its governing documents and the authority to construe them "conclusively," *id.* at 1123, give itself *any* authority over the principal of the Sterne–Elder Trust as long as the trust's "most essential purpose" remains intact. *Id.* at 1125. Under this interpretation, there would be nothing to stop The Denver Foundation from disbursing the Trust principal to end-user charities. Indeed, the Sternes' "most essential purpose" might simply be to put their money to good use in the future—a purpose that distribution to end-user charities would certainly serve. The majority states that its holding does not permit such a result, *see id.* at 1125 n. 15, but nothing in its rationale would prohibit it. I, like the majority, do not question the good faith of The Denver Foundation. *See id.* at 1124. But the question here is not one of The Denver Foundation's good faith; rather, it is whether the Foundation can override the language of the 1976 Trust Agreement by amending its governing documents incorporated into that Agreement. In my view, The Denver Foundation does not have the authority to revise a trust document's provisions through incorporation.

Accordingly, because I believe The Denver Foundation cannot contradict the express terms of a trust agreement, and therefore cannot, through the vehicle of incorporation, give itself authority to transfer the principal of the Sterne–Elder Trust and thereby become trustee, I respectfully dissent.

I am authorized to say that Justice RICE and Justice COATS join in this dissent.