Opinion by JUDGE J. JONES
*801 ¶ 1 This is a probate case. The former personal representative (PR) of the estate, Vicki J. Sandstead (Sandstead), appeals five orders: (1) the October 4, 2011, order regarding the motion for surcharge; (2) the May 11, 2012, order denying her motion for reconsideration or for a new trial; (3) the June 14, 2012, order granting in part, and reserving in part, the motion for surcharge and other relief; (4) the December 9, 2013, order concerning attorney fees, costs, and expenses; and (5) the December 20, 2013, order concerning the motion for final surcharge. We affirm in part, reverse in part, and remand with directions the first, third, and fifth orders regarding surcharges. Because of how we resolve Sandstead's challenges to the first, third, and fifth orders, we need not address the second order denying the motion for reconsideration or for a new trial. We vacate and remand the fourth order concerning attorney fees, costs, and expenses.
¶ 2 Shauna Sandstead Corona (Corona), an heir of the decedent, cross-appeals the district court's October 21, 2013, order enforcing an in terrorem clause. We affirm that order.
I. Background
¶ 3 Willard and Auriel Sandstead were married, had three daughters, and lived in Sterling, Colorado. They owned several pieces of real property (a farm in Colorado, a condominium in Florida, and a house in Sterling, Colorado) and a large collection of personal items.
¶ 4 Willard and Auriel executed wills in 1991; subsequently, they each executed second wills and a related revocable trust in 2000. On February 28, 2007, they signed a revocation of the revocable trust on advice from their attorney, who had not seen the trust. And on March 6, 2007, they also signed durable powers of attorney naming two of their daughters-Sandstead and Corona-as their attorneys-in-fact.
¶ 5 Throughout their lives, Willard and Auriel sought to minimize or avoid probate of their estates upon their deaths. They took steps to simplify their affairs so that Sandstead and Corona would divide their property equally without the property entering probate.[1]
¶ 6 One such step involved the sale of the family farm. Willard and Auriel began to arrange the sale before Willard's death. Willard died on March 14, 2007. Auriel proceeded with the sale and put the money from the sale into an account at Wells Fargo bank in Sterling. The Wells Fargo account was a multi-party account with Auriel, Sandstead, and Corona as joint signatories. It is undisputed that Auriel placed the farm sale funds into this multi-party account to avoid probate on her death.
¶ 7 After Willard's death, Auriel opened his estate by lodging his will from 1991, but did not tell her attorney that Willard had executed a second will in 2000.
¶ 8 In June 2007, Sandstead moved about $200,000 from the Wells Fargo account to Citizens Bank accounts in Boston, where Sandstead lived.[2] The only two signatories on the Citizens Bank accounts were Sandstead and Auriel; though Corona was aware of the accounts, she was not a signatory on any of those accounts because of logistical difficulties relating to Corona living in Mexico (where she had lived since 1977). Sandstead testified that her mother agreed to move the money because Sandstead had had a falling out with a banker at Wells Fargo and it would be easier for Sandstead to manage the funds where she lived. Sandstead considered the money in the Citizens Bank accounts to be Auriel's money to be used for Auriel's care until her death, and then to be split equally between herself and Corona, as her parents intended.
*802 ¶ 9 Both Sandstead and Corona were placed on the titles for the house in Sterling and the condominium in Florida before their parents' deaths.[3] Before Auriel's death, Sandstead used money from the joint Citizens Bank accounts to pay for work and trips allegedly related to the condominium in Florida.
¶ 10 Auriel died on November 25, 2007. On that date, the Wells Fargo account had a balance of $67,972, and the Citizens Bank accounts had a total balance of $179,790.46.
¶ 11 On June 18, 2008, both Sandstead and Corona met with their parents' lawyer to sign a small estate affidavit representing that the value of the estate was less than $50,000.[4] Willard and Auriel's lawyer believed a small estate affidavit was appropriate since Willard and Auriel had deeded their real property to their daughters and had placed their money in joint bank accounts, leaving only personal property in the estate.[5]
¶ 12 About a year later, Sandstead contacted an attorney because she believed personal items were missing from her mother's estate. The attorney told Sandstead that to try and reclaim estate property, she would have to file a probate case. Sandstead opened a probate case, and was appointed PR in June 2009. After being appointed PR, Sandstead opened an estate account at Citizens Bank and placed funds from the other Citizens Bank accounts into this estate account.
¶ 13 After their mother's death, Sandstead and Corona began to disagree about matters relating to their parents' former property. Disagreements arose regarding gifts from the estate, expenditures from the bank accounts, and distribution of money.
¶ 14 On May 11, 2010, Corona filed a petition to remove Sandstead as PR. On June 10, 2010, Sandstead resigned as PR, and she and Corona agreed to the appointment of a successor.
¶ 15 On February 10, 2011, Corona filed a motion for surcharge, attorney's fees, and other relief against Sandstead expressly limited to Sandstead's alleged actions as PR. See § 15-10-504(2), C.R.S.2015 (providing that a court may surcharge a "fiduciary for any damage or loss to the estate, beneficiaries, or interested persons" resulting from a breach of fiduciary duty or improper exercise of power by a fiduciary). The motion alleged, in only the most general terms, mismanagement of estate funds and property, and "damage or loss to the estate and/or to [Corona]."
¶ 16 On July 11, 2011, seven days before the surcharge hearing, Sandstead filed a motion in limine to prohibit evidence regarding the $230,000 transferred from the Wells Fargo account to Citizens Bank because the transfers had occurred before Auriel's death and the funds were not property of Auriel's estate. The court granted the motion in limine, ruling that because Corona had sued Sandstead only in her capacity as PR, the court did not have personal or subject matter jurisdiction regarding any claims against Sandstead as an alleged fiduciary before being appointed PR.
¶ 17 Despite granting the motion in limine, at the hearing on July 18, 2011, the court allowed Corona's attorney to ask questions about transactions and money transfers occurring before Auriel's death. The court said such questioning was relevant to trace where the estate account money came from, but agreed with Sandstead's attorney that it was not relevant to any dispute between the sisters regarding funds expended before Sandstead was appointed PR because that was not a probate issue. At the hearing, Corona's counsel argued repeatedly that Sandstead had breached her fiduciary duties to Corona personally.[6]
*803 ¶ 18 In its first written post-hearing order on the motion for surcharge, the court found, notwithstanding its prior rulings, and notwithstanding Corona's counsel's contention that Sandstead had violated her fiduciary duties to Corona, that Sandstead was an estate fiduciary as to the money in Citizens Bank accounts because Sandstead had acted under an agency created by the March 2007 durable power of attorney in transferring the money from Wells Fargo to Citizens Bank, and had established an implied trust, the assets of which were later administered in the estate under Sandstead's authority as PR. The court determined that its prior granting of the motion in limine was merely a preliminary order that it could reconsider based on changed circumstances; the evidence at trial persuaded the court to change course. The court ordered surcharges against Sandstead for actions she took before Auriel's death; after Auriel's death, but before her appointment as PR; and after her appointment as PR. Many of those actions related to the farm sale funds originally placed in the Wells Fargo account, but some related to tangible estate property. The court reserved judgment on certain potential surcharges pending investigation and reports.
¶ 19 Sandstead filed a motion for reconsideration or for a new trial in February 2012, objecting to the court's decision to surcharge her for actions predating her appointment as PR and relating to expenditures of funds transferred from the Wells Fargo account before Auriel's death. The court denied the motion on May 11, 2012.
¶ 20 That same day, Corona filed a motion for final surcharge and other relief. The court issued an order granting the motion in part and reserving ruling in part on June 14, 2012.
¶ 21 Sometime after the surcharge hearing, Willard and Auriel's 2000 wills and the 2000 revocable trust instrument were discovered. On September 21, 2012, Sandstead filed a petition for formal probate of Auriel's 2000 will and a motion for determination of the validity of the 2000 revocable trust. In 2013, the court held a hearing on the validity of the 2000 will and revocable trust. Corona challenged the validity of the 2000 revocable trust because of the written revocation signed by both Willard and Auriel. Corona contended Willard and Auriel had also revoked their 2000 wills because they were unaware those wills existed, had relied on their 1991 wills, and their conduct indicated their intention that their estate be divided evenly between Sandstead and Corona. (The 2000 wills and trust gave ten percent of their residual estates to each of two grandsons and forty percent each to Sandstead and Corona, thereby reducing each sister's share.)
¶ 22 The court held a hearing on the validity of the 2000 will and trust on February 25, 2013, and admitted Auriel's 2000 will to probate on March 21, 2013.
¶ 23 The court found the trust revocation was invalid because of Willard and Auriel's impaired functioning and insufficient information from their attorney. The court also found that Auriel's 2000 will was valid because under section 15-11-507(1) and sections 15-11-803 and - 804, C.R.S.2015, a will can be revoked in only two ways-by a physical act or by means of a later will-and neither had occurred. And the court found that there was no evidence Willard and Auriel intended to disinherit their grandchildren.
¶ 24 On September 30, 2013, Sandstead and her two nephews filed a motion to enforce the incontestability provision (the so-called "in terrorem clause") in the 2000 trust. They argued that because Corona had contested the validity of the 2000 will and trust, she could no longer be a beneficiary of either. Corona argued that the in terrorem clause was not enforceable because she had probable cause to challenge both the 2000 will and the trust.
¶ 25 On October 21, 2013, the court issued an order enforcing the in terrorem clause as to the 2000 will but not as to the trust. The court found that while Corona had probable cause to challenge the trust-based on the written revocation-she lacked probable cause to challenge the will; Corona had not produced evidence that she could reasonably have thought the will had been revoked by either means authorized under the Probate Code, and there was no evidence that Willard *804 and Auriel had intended to disinherit their grandchildren.[7]
¶ 26 Corona filed a motion to reconsider, which the court denied. On December 9, 2013, the court issued an order granting Corona attorney fees and costs relating to the surcharge motion. And on December 20, 2013, the court issued an order against Sandstead and in favor of the estate concerning the motion for final surcharge.
II. Discussion
¶ 27 Sandstead contends that the district court erred by: (1) surcharging her for actions she took before her appointment as PR relating to non-probate funds; (2) surcharging her for actions as to which the court had ruled Corona could not present evidence; and (3) awarding attorney's fees to Corona.
¶ 28 Corona contends that the district court erred in enforcing the in terrorem clause to preclude her from benefiting under Auriel's 2000 will.
¶ 29 We address each party's contentions in turn.
A. Surcharges
¶ 30 In essence, Sandstead contends that the statutes under which probate cases are administered, and which pertain specifically to the surcharging of fiduciaries, did not give the district court authority to decide disputes between her and Corona over expenditure of the farm sale proceeds because those funds were not estate funds and she did not expend those funds in any fiduciary capacity vis-à -vis the estate.
1. Standard of Review
¶ 31 Sandstead does not challenge historical facts found by the district court.[8] Rather, she challenges the court's application of the law to those facts. Her arguments present issues of statutory interpretation, which we review de novo. Oldham v. Pedrie, 2015 COA 95, ¶ 9, 411 P.3d 933. When interpreting statutes, we give effect to the General Assembly's intent. Id. (citing Jefferson Cty. Bd. of Equalization v. Gerganoff, 241 P.3d 932, 935 (Colo.2010) ). To determine the General Assembly's intent, we consider the context of the statute as a whole and look to the statute's plain language, giving that language its commonly understood meaning. Id. ; accord Farmers Grp., Inc. v. Williams, 805 P.2d 419, 422 (Colo.1991).
2. Multi-Party Bank Accounts
¶ 32 Part 5 of article 10 of the Probate Code gives a court authority to take actions with respect to certain "fiduciaries" over which it has acquired jurisdiction to protect the interests of those as to whom fiduciaries owe their duties. As immediately relevant, the court may surcharge a PR-that is, order a PR to reimburse the estate-for mismanagement of an estate. See §§ 15-10-501(2)(c), (3), - 504(2), C.R.S.2015. An "estate" means, again as relevant here, "the estate of a decedent." § 15-10-501(2)(b). "Estate" is further defined as "the property of the decedent." § 15-10-201(17), C.R.S.2015. In delineating the court's powers to oversee and sanction a PR, part 5 repeatedly phrases that power in terms of actions with respect to estate property. §§ 15-10-501(2)(b), (c), (3) ; 15-10-502(1)(a); 15-10-503 ; 15-10-504(1)(a); 15-10-505(1)(a), C.R.S.2015. We are convinced, therefore, that any proceeding to surcharge a PR of an estate must pertain to the PR's actions vis-à -vis estate property.
¶ 33 Sandstead contends that the district court should not have surcharged her for actions related to the farm sales proceeds, which were placed in joint bank accounts before Auriel's death, because that money was not estate property. We agree.
¶ 34 Sums in a joint bank account are non-probate property. "During the lifetime of all parties, an account belongs to the parties in *805 proportion to the net contribution of each to the sums on deposit." § 15-15-211(2), C.R.S.2015. But, upon one party's death, the money automatically passes by operation of law to the surviving parties on the account. § 15-15-212(1), C.R.S.2015. "If two or more parties survive and none is the surviving spouse of the decedent, the amount to which the decedent ... was beneficially entitled under section 15-15-211 belongs to the surviving parties in equal shares...." Id. "Sums remaining on deposit at the death of a party to a multiple-party account ... belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention ." § 15-15-212(5) (emphasis added). And "a transfer resulting from the application of section 15-15-212 is effective by reason of the terms of the account involved and this part 2 and is not testamentary or subject to articles 10 to 13 of this title (estate administration) ." § 15-15-214, C.R.S.2015 (emphasis added).
¶ 35 In re Estate of Beasley, 40 Colo.App. 347, 578 P.2d 662 (1978), is substantially on point. In that case the decedent established two savings accounts before her death in her name and those of her two daughters. The accounts were in joint tenancy, with rights of survivorship. The parties intended that upon the death of one of them, the others would receive the entire amount in the accounts. Shortly before the decedent died, one of the sisters withdrew substantially all of the funds in the accounts. After the decedent died, the other sister, who was the estate's PR, asserted a claim for half of the withdrawn funds on behalf of the estate. The district court awarded the estate half the funds, but a division of this court reversed. The division held that under the terms of the account the withdrawals were lawful, and that those withdrawals did not destroy the joint tenancy nature of the account. Accordingly, the estate had no claim to the funds. Id. at 348-49, 578 P.2d at 663.
¶ 36 In this case, it is undisputed (and the district court so found) that Auriel contributed all of the money in the Wells Fargo and Citizens Bank accounts, intending that the funds would go to Sandstead and Corona upon her death without going through probate. It is likewise undisputed that the transfer to the Citizens Bank accounts was made for the same purpose. By operation of law, during Auriel's lifetime, the money in the Wells Fargo account was hers, though both Sandstead and Corona could withdraw funds. Likewise, by operation of law, during Auriel's lifetime the money in the Citizens Bank accounts was hers, though Sandstead could withdraw funds. But upon Auriel's death, by operation of law, the money in the Wells Fargo account belonged to Sandstead and Corona in equal shares while the money in the Citizens Bank accounts belonged to Sandstead alone (subject to Corona's claim to one-half of the funds); the estate had no claim to the money. See § 15-15-212(1), (5) ; § 15-15-214 ; In re Estate of Beasley, 40 Colo.App. at 347-48, 578 P.2d at 663.[9] Thus, because there is not "clear and convincing evidence" that Auriel intended the money to be subject to probate (indeed, all evidence is to the contrary), see § 15-12-212(5), by law the money in the accounts was never property of Auriel's estate.
¶ 37 Taking a position Corona never asserted, the district court applied an exception to the rules governing multi-party accounts to conclude that the funds in the Citizens Bank accounts were estate property. Under section 15-15-202, C.R.S.2015, the provisions of title 15, section 15 regarding multi-party accounts do not apply to "a fiduciary or trust account in which the relationship is established other than by the terms of the account." The district court determined that section 15-15-202 applied to Sandstead's account transfers because in transferring money from Wells Fargo to Citizens Bank, she created a type of trust account.[10] We disagree because there is no evidence the farm sale proceeds were placed in these accounts for any purpose other than to avoid probate; indeed, it is undisputed that the money was *806 placed in these accounts precisely to avoid probate by operation of the rules governing multi-party accounts. Sandstead testified, without contradiction, that the money was transferred because she had had a falling out with a Wells Fargo employee and it would be easier to manage the funds where she lived. Sandstead and Corona agreed all along that the money was to be used for Auriel's care, and then split between them upon Auriel's death. However, this was not a strict or formal arrangement. While Auriel was still alive, the money was also used to pay for things like renovations to the Florida condominium (which had been deeded to the sisters) and travel expenses. There is simply no evidence the accounts were created or used as a fiduciary or trust accounts.
¶ 38 Apparently, the district court based its conclusion on the fact that Sandstead was Auriel's attorney-in-fact at the time of the transfer by virtue of the durable power of attorney.[11] But Sandstead did not use that authority or need to use that authority to make the transfer; her status as signatory was alone sufficient to allow her to do so.
¶ 39 The fact a person possesses a power of attorney to act for another person does not transform every action affecting the other person by the one in possession of such power into one pursuant to that power. The purpose of a durable power of attorney is obviously to allow the holder of that power to do things she otherwise would have no legal authority to do. And using such a power requires presenting the document creating it to establish one's authority to act. For instance, Sandstead testified that she had to "send [the] power of attorney to some of the billing companies to stop billing, or to make payments, or to close accounts" after her parents died. But Sandstead had legal authority to transfer the funds in the Wells Fargo account independent of the power of attorney, and there was no evidence that she acted pursuant to or presented the power of attorney for that purpose.
¶ 40 The district court also concluded that the Citizens Bank money was estate property because Sandstead had put some of the money in a Citizens Bank estate account in 2009 and had listed the amount in a Citizens Bank estate account in two estate inventory forms after opening formal probate in 2009. The district court said that Sandstead's "treatment of the Citizens' Bank Funds as estate property constituted a judicial admission that she did not claim them, individually."[12] Again, we disagree.
¶ 41 "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo.1986).
¶ 42 We conclude that there was no judicial admission, for three reasons. First, we are not persuaded that the context of Sandstead's actions shows an unequivocal, deliberate declaration that the farm sale proceeds were estate funds. See Gonzales v. Windlan, 2014 COA 176, ¶¶ 45-46, 411 P.3d 878 (alleged judicial admission must be considered in context). Sandstead testified that she placed some of the farm sale proceeds in an estate account and showed them on estate inventory forms because of perhaps dubious legal advice that doing so would facilitate resolution of disputes over other property that did belong to the estate. There was no contrary evidence. She has at all times since they became an issue maintained that the farm sale proceeds were never estate funds.[13] And we note that because at all relevant times Sandstead and Corona believed themselves *807 to be the sole heirs of Auriel's estate, disbursing the funds through probate would have the same effect as disbursing them outside probate-both would receive one-half of the funds. See Bd. of Cty. Comm'rs v. Rohrbach, 226 P.3d 1184, 1189 (Colo.App.2009) (where property owners contested the zoning of their property in the litigation, statement in their use permit application that their property was zoned agricultural was not an unequivocal or formal declaration so as to constitute a judicial admission).
¶ 43 The partial dissent says, however, that Sandstead did not claim that the farm sale proceeds were not estate funds until July 2011. But the record shows that Sandstead took that position earlier when the status of the funds first appeared to be an issue. And the record shows that Sandstead continued to adhere to that position throughout litigation over her actions.
¶ 44 As noted, the motion for surcharge expressly challenged only actions Sandstead had taken as PR relating to estate property. Sandstead was not appointed PR until two years after she had transferred the money to Citizens Bank.
¶ 45 In her response to the motion for surcharge, filed March 2, 2011, Sandstead let it be known that she considered any dispute relating to spending farm sale proceeds to be off limits. The response stated: "Monies held in joint bank accounts due to the decedent putting that money into a joint bank account before her death deprives the probate court of jurisdiction to administer those funds or to adjudicate how those funds were spent."
¶ 46 Both Sandstead and Corona filed trial briefs on July 8, 2011, in advance of the hearing on the surcharge motion. In her trial brief, Sandstead again argued expressly that the farm sale proceeds transferred to Citizens Bank were not estate property because those funds were in "a joint bank account which passed to the survivor outside of the will."[14]
¶ 47 Corona's trial brief sought, for the first time, to challenge actions Sandstead took before her appointment as PR, and claimed that, as to all the money transferred to Citizens Bank, Sandstead had breached her fiduciary duties to Corona . The brief referred to three separate transfers: (1) a transfer of "$200,000 from a bank account in Colorado that was jointly owned by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts" on "June 20, 2007"; (2) a transfer of "$10,000" on "August 2, 2007"; and (3) a transfer of "$20,000" on "November 19, 2007." Corona's brief did not allege expressly that the money in the Citizens Bank accounts was estate property, nor did it allege expressly that Sandstead had breached any duty to Auriel or the estate with respect to that money. It did allege that Sandstead had breached her fiduciary duties to Corona "with [r]espect to [f]unds [c]ontrolled by [Sandstead] as well as [e]state [p]roperty," placing the farm sale proceeds in the former category by then alleging that Sandstead controlled those proceeds "which [Sandstead] held for the benefit of them both."
¶ 48 It was in response to Corona's new allegations that Sandstead filed her motion in limine three days later.[15] She expressly moved "to prohibit the introduction of evidence regarding" all three transfers mentioned in Corona's trial brief, including "$200,000 transferred from a jointly owned bank account on June 20, 2007, while the Decedent was still alive...." The motion argued that the court lacked jurisdiction to resolve disputes over those "non-estate funds." As to the $200,000 transfer to Citizens Bank specifically, the motion also said as follows:
• "1. On page 1 of [Corona's] Trial Brief, [Corona] describes a transfer of $200,000 from a bank account in Colorado that was owned jointly by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts *808 that were owned by [Auriel] and [Sandstead] only."
• "2. This statement is repeated on page 5 under the heading entitled The Respondent was Acting as Petitioner's Fiduciary With Respect to Funds Controlled by Respondent as Well as Estate Property."
• "8. ... This Court does not have subject matter jurisdiction to litigate an expanded claim for breach of fiduciary duty involving over $200,000 worth of funds that were transferred from a bank account to which Vicki Sandstead was a signatory and owner which transfers were made during the [Auriel's] lifetime and with [Auriel's] knowledge and permission."
¶ 49 In claiming that the motion in limine "indicated at most, that the $30,000 of the funds in the Citizens Bank account ... were not part of the estate" the dissent ignores the plain language of the motion and of Corona's trial brief to which it was responding. The motion is crystal clear that Sandstead's position was that none of the money transferred to Citizens Bank was estate property.
¶ 50 Second, there is no indication that the statements in the estate inventory forms were made "for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter, 713 P.2d at 1279 ; see Salazar v. Am. Sterilizer Co., 5 P.3d 357, 365 (Colo.App.2000) (allegation in complaint was not a judicial admission because it was not unequivocal and because there was no indication it was made for the purpose of dispensing with proof of an issue in the litigation). As noted, from the onset of litigation pertaining to the funds, Sandstead maintained that they were not estate property. And the context of the statement was probate, not litigation in which the ownership of the funds was at issue. Cf. In re Estate of Hill, 281 Mont. 142, 931 P.2d 1320, 1325 (1997) (party's signing of estate inventory form listing bank accounts as estate property was not a judicial admission because it was made in the context of probate, not litigation).
¶ 51 The dissent says that the statements were made in the context of litigation simply because Corona at one point moved to remove Sandstead as PR and later filed a motion for surcharges. Again, this is mistaken.
¶ 52 Neither the motion to remove Sandstead as PR nor the motion for surcharges requested that Sandstead be required to file estate inventory forms. Sandstead filed those forms in her capacity as PR as required by section 15-12-706(1), C.R.S.2015 (requiring a PR to file such a form "[w]ithin three months after [her] appointment"); and by section 15-12-708, C.R.S.2015 (requiring a PR to file a supplementary inventory if additional information comes to light). She filed both forms before Corona gave anyone any indication that she was making any claim regarding the money in the Citizens Bank accounts. And Corona did not even mention the inventory forms until after Sandstead had filed them, and even then did so in her trial brief only in passing to note that Sandstead had filed such forms.[16]
¶ 53 Third, the status of the funds is largely a legal question, determined by statutes governing multi-party bank accounts and principles of estate and trust law. The judicial admission doctrine does not apply to questions of law. See Rohrbach, 226 P.3d at 1189 ; Miller v. Brannon, 207 P.3d 923, 929 (Colo.App.2009).
¶ 54 In sum, we conclude that the district court erroneously applied the law in determining that the farm sale proceeds were estate funds. By law they were never estate funds, and therefore the court could not surcharge *809 Sandstead for her expenditure of those funds.
3. Fiduciary Duty Before Appointment as PR
¶ 55 Sandstead also contends she should not be surcharged for actions she took before the court appointed her PR of the estate because she had no fiduciary duty to the estate before her appointment. Again, we agree.[17]
¶ 56 Corona requested surcharges against Sandstead in her role as PR under section 15-10-504(2) ; however, the district court also surcharged Sandstead for actions she took before her appointment as PR. The district court ruled it could surcharge Sandstead for such actions because she acted as a fiduciary under sections 15-10-501(1) and 15-10-501(2)(c) as both her mother's agent under the durable power of attorney and as a trustee of an implied trust regarding the money in the joint bank accounts. The district court erred.
¶ 57 As discussed, the farm sale proceeds never became estate funds. Nor was there any evidence Sandstead acted pursuant to the power of attorney with respect to those proceeds. And there is no basis in the record for imposing or finding an implied trust regarding the farm sale proceeds vis-à -vis the estate. "Both resulting and constructive trusts are implied trusts, where the intent of the parties to form a trust is not apparent." Shepler v. Whalen, 119 P.3d 1084, 1089 (Colo.2005) (adopting the analysis of George Gleason Bogert & George Taylor Bogert, Trusts & Trustees § 451, at 225 (2d rev. ed.1991) ). Resulting trusts are "intent-enforcing" trusts while constructive trusts are "fraud-rectifying" trusts. Id. A resulting trust is "[a] remedy imposed by equity when property is transferred under circumstances suggesting that the transferor did not intend for the transferee to have the beneficial interest in the property." Black's Law Dictionary 1746 (10th ed. 2014). And a constructive trust is "[a]n equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it." Id. at 1742. The district court did not specify which type of implied trust was created when Sandstead moved money from Wells Fargo to Citizens Bank; however, we find no basis for either.
¶ 58 As discussed, Sandstead had legal authority independent of the power of attorney or her relationship with her mother to move money from Wells Fargo to Citizens Bank. See In re Estate of Beasley, 40 Colo.App. at 348-49, 578 P.2d at 663. There is no evidence of fraud (and the court did not find fraud). Thus, imposition of an implied trust was not an appropriate remedy. Therefore, we conclude that there was no legal basis for the district court's purported exercise of jurisdiction over Sandstead's pre-appointment conduct.[18] Under the circumstances, prior to her appointment, Sandstead was not a fiduciary of the estate.[19] Thus, surcharging her for the estate's benefit for acts prior to her appointment (and which related to non-estate funds) was not allowed by section 15-10-504.
¶ 59 Because the money in the joint bank accounts was never estate property, and because Sandstead did not act as a fiduciary vis-à -vis the estate before her appointment as PR, we reverse and remand for the district court to determine what surcharges remain against Sandstead for her actions after appointment as PR.[20] Because of how we resolve *810 the surcharge issues as to Sandstead's actions before her appointment as PR, we need not address her contention regarding her motion to reconsider.[21]
B. Attorney Fees and Costs
¶ 60 The district court awarded attorney fees and costs to Corona under section 15-10-504(2)(a), which allows an award of attorney fees and costs where the court finds a breach of fiduciary duty has occurred. Based on our resolution of Sandstead's other contentions, we vacate the order awarding attorney fees and costs. We remand for the district court to re-evaluate and award attorney fees and costs based on Sandstead's actions relating to estate property while she was PR.
C. In Terrorem Clause
¶ 61 We reject Corona's contention on cross-appeal that the court erred by enforcing the in terrorem clause.
1. Standard of Review and Applicable Law
¶ 62 Interpretation of a will or a trust is a question of law we review de novo. In re Estate of Hope, 223 P.3d 119, 122 (Colo.App.2007) ; Matter of Trusts Created by Ferguson, 929 P.2d 33, 35 (Colo.App.1996). We strive to give effect to the intent of the testator. In re Estate of Hope, 223 P.3d at 122.
¶ 63 Courts generally do not enforce an in terrorem (no-contest) clause when a beneficiary acts in good faith and has probable cause to challenge the will. In re Estate of Peppler, 971 P.2d 694, 697 (Colo.App.1998) ; see § 15-12-905, C.R.S.2015. In the context of wills, probable cause is "the existence, at the time of the initiation of the proceeding, of evidence which would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the contest or attack will be successful." In re Estate of Peppler, 971 P.2d at 697 (quoting Restatement (Second) of Property § 9.1 cmt. j (Am Law Inst.1981)). A finding of probable cause requires "a determination of whether a 'reasonable person, properly informed and advised' would have concluded" that a challenge to the will would succeed. Id. at 698.
¶ 64 "Whether a beneficiary's acts violate a no-contest clause may depend on how broadly the clause is drafted." Id. at 696 (citing M. Begleiter, Anti-Contest Clauses: When You Care Enough to Send the Final Threat, 26 Ariz. St. L.J. 629 (1984) ). A testator's choice of words may evidence an intent to broaden the applicability of a no-contest clause. Id. (finding the words "directly or indirectly" were evidence of testator's intent to broaden the applicability of a no-contest clause such that offering a subsequent will for probate constituted a contest of the original will).
¶ 65 Colorado law provides two means of revoking a will: (1) "[b]y executing a subsequent will that revokes the previous will" or (2) "[b]y performing a revocatory act on the will," i.e. "burning, tearing, canceling, obliterating, *811 or destroying the will...." § 15-11-507(1)(a) & (b).
2. Enforcement of the In Terrorem Clause
¶ 66 Corona argues that (1) the in terrorem clause applies only to the trust and (2) she had probable cause to challenge the validity of the will.
¶ 67 "A writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification." § 15-11-510, C.R.S.2015; see Denver Found. v. Wells Fargo Bank, N.A., 163 P.3d 1116, 1122 (Colo.2007) (when determining a settlor's intent, all documents at issue-including those incorporated by reference-are read as a whole).
¶ 68 Auriel's 2000 will expressly incorporates the trust "specifically and completely" by reference. So, although the physical text of the trust, not that of the will, contains the in terrorem clause, that clause is part of the will.
¶ 69 We agree with the district court that Corona did not have probable cause to challenge Auriel's will. In its order enforcing the in terrorem clause, the district court found there was probable cause to challenge the trust because Willard and Auriel had signed a written revocation of the trust and attempted to transfer land out of the trust. However, the court found no evidence of probable cause to challenge the will.
¶ 70 As stated above, there are two ways to revoke a will in Colorado: (1) executing a subsequent will or (2) physically destroying the will. § 15-11-507(1) ; In re Estate of Schumacher, 253 P.3d 1280, 1282 (Colo.App.2011) ("A will can be revoked only in the manner provided by statute, and the statutory provisions for revocation of wills must be strictly construed." (quoting In re Estate of Haurin, 43 Colo.App. 296, 297, 605 P.2d 65, 66 (1979) )); Matter of Tong's Estate, 619 P.2d 91, 91 (Colo.App.1980) ("A will is revoked if, with intent to revoke, a testator performs any one of the acts deemed sufficient by statute to effectuate a revocation."). The court found no evidence that Corona could have reasonably thought the will had been revoked by either of these means. The court noted that there was no evidence of a subsequent will and no evidence that Willard and Auriel ever attempted to physically destroy their 2000 wills. The statutory requirements for revocation were unmet, and Corona could not reasonably have believed otherwise.
¶ 71 Corona nonetheless contends the district court should not have limited itself to the two statutory revocation methods and erred by not considering other factors such as intent, presumptive revocation of a will when a trust is revoked, equity, and mistake. However, Corona does not cite-and we could not find-legal support for her argument that such factors supersede statutory authority regarding will revocation. Indeed, Colorado law is to the contrary. In re Estate of Schumacher, 253 P.3d at 1282 ; In re Estate of Haurin, 43 Colo.App. at 297, 605 P.2d at 66.[22]
¶ 72 Nor are we persuaded by Corona's argument that the district court as much as found probable cause to challenge the will when it said that she "had to" challenge the will. The court said Corona had to challenge the will when observing that for Corona to accomplish her goal of defeating her parents' intent to provide for their grandchildren, she needed to challenge both the will and the trust. The court did not thereby imply that any challenge to the will was supported by probable cause.
¶ 73 And finally, we are not persuaded by Corona's argument that the incorporation clause was subject to an unfulfilled condition precedent-i.e., that the trust not be in effect upon Auriel's death. Grammatically speaking, *812 the clause incorporating the trust was not dependent on whether the trust was in effect on Auriel's death.
III. Conclusion
¶ 74 The orders regarding surcharges are affirmed in part and reversed in part. The case is remanded for recalculation of surcharges based only on Sandstead's actions relating to estate property while she served as PR.
¶ 75 The order regarding attorney fees, costs, and expenses is vacated. On remand, the court should reconsider its award based on the outcome of this appeal.
¶ 76 The order enforcing the in terrorem clause is affirmed.
JUDGE HARRIS concurs.
JUDGE TAUBMAN concurs in part and dissents in part.

They intentionally disinherited their third daughter.

Sandstead transferred an additional $30,000 to Citizens Bank later in 2007.

The trust held title to the condominium and house when they were deeded to Sandstead and Corona. When the district court ruled the trust had not been revoked and was still valid, the deeds were deemed invalid. Neither party appeals this issue.

To avoid formal probate for small estates, section 15-12-1201(1)(a), C.R.S.2015, allows small estate administrative procedures where the estate "does not exceed twice the amount set forth in section 15-11-403, as adjusted by section 15-10-112."

Both Sandstead and Corona testified to this.

As discussed below, Corona's trial brief argued similarly, at least as to the money in the Citizens Bank accounts.

The court also noted that if, as Corona claimed, her parents were unaware of the 2000 wills, "it was hard to imagine how Ms. Corona could honestly believe that her parents 'revoked' such a will."

The one possible exception is her contention that she did not create an implied trust by transferring money from Wells Fargo to Citizens Bank in 2007. To the extent that finding is factual in nature, or based on factual findings that Sandstead disputes, we review for clear error. Van Gundy v. Van Gundy, 2012 COA 194, ¶ 12, 292 P.3d 1201.

Sandstead conceded at the surcharge hearing that one-half of the funds in the Citizens Bank accounts belonged to Corona because of their parents' intent that they split the farm sale proceeds outside of probate.

Of course, that rationale would not apply to funds that remained in the Wells Fargo account, but the district court did not make that distinction.

Corona made no such argument in the district court.

This position was contrary to the position the district court took at the hearing. At the beginning of the hearing, Sandstead's attorney said Sandstead "put ... non estate money into that [Citizens Bank] estate account." (Emphasis added.) Counsel asked hypothetically, "Can one create an estate asset that did not exist on date of death ?" (emphasis added), and then said, "I don't have an answer." The court said, "Sounds like a loan, a loan to the estate." Sandstead's counsel then agreed that was a legitimate way to look at it. The court then reiterated, "sounds to me like a loan."

Indeed, as noted, Corona never alleged that the funds were estate funds; she alleged instead that Sandstead owed her fiduciary duties as to those funds, which Sandstead had breached.

The brief also said that "the only remaining property of the decedent at the time of her death was her personal property consisting of the contents of her house ... in Sterling, Colorado."

The motion in limine said: "Respondent is filing this motion after reading the Trial Brief which petitioner filed on Friday, July 8, 2011. Contrary to the issues raised by Petitioner's Motion for Surcharge and the restatement of those issues in the Trial Management Order, the Trial Brief states that Petitioner intends to materially and significantly expand the nature of the proceedings."

The dissent also appears to rely on the fact that money from the accounts was spent on matters related to the estate. But the dissent cites no authority, and we are aware of none, which holds that such expenditures transform those funds, as well as funds not so spent, from non-estate property into estate property. The money was, as a matter of law, Sandstead's to do with as she pleased (subject to any claim by Corona to one-half of the funds); her decision to spend some of that money on matters related to the estate is simply inconsequential in this context. Further, we note that much of the money was spent in relation to real property which, at the time, all parties believed not to be part of the estate by virtue of deeds executed before the deaths of Willard and Auriel.

Arguably we need not decide this issue in light of our conclusion that the farm sale proceeds were never estate property because it appears that the surcharges for pre-appointment conduct related to expenditures of those proceeds.

Of course the district court had jurisdiction to determine whether the bank account funds were estate property. See §§ 13-9-103(3), 15-10-302, C.R.S.2015; In re Estate of Murphy, 195 P.3d 1147, 1151 (Colo.App.2008). But because, as a matter of law, those funds did not belong to the estate, the district court had no jurisdiction to determine disputes between the sisters over them.

On appeal, Corona attempts to justify the surcharges by arguing, as she did in the district court, that Sandstead owed her fiduciary duties. But the district court did not find that Sandstead had breached any fiduciary duty to Corona, and, in any event, we see no basis in the Probate Code for the court to adjudicate disputes over non-probate property unrelated to any duty owed to the estate.

Sandstead did not appeal surcharges related to her administration of estate personal property while PR, so we affirm as to those surcharges.

We are, however, troubled by the district court's process. Its ruling on the motion in limine was in the nature of a dismissal of claims because it precluded evidence relating to claims of improper actions relating to the money in the Citizens Bank accounts and pre-dating Sandstead's appointment as PR. And the court expressly reiterated at the hearing that such claims would not be considered. By nonetheless ruling against Sandstead on such claims, without any advance notice or opportunity to be heard, and based on theories Corona had never advanced, the district court arguably violated Sandstead's rights to notice and to present evidence. See Dinosaur Park Invs., L.L.C. v. Tello, 192 P.3d 513, 518 (Colo.App.2008). The fact the court's ruling on a motion in limine ordinarily is preliminary did not give the court license to change its mind without consideration of the situation in which it had placed Sandstead by virtue of its earlier rulings. The dissent concludes that the court acted appropriately because Sandstead did not raise the issue until her post-trial motion and did not support that motion with an affidavit as required by C.R.C.P. 59(d). But, as discussed, Sandstead clearly raised the issue before the hearing (and during the hearing). And her motion was not a C.R.C.P. 59 motion. Such motions are those filed after "entry of judgment as provided in C.R.C.P. 58." C.R.C.P. 59(a). There was no such judgment when Sandstead filed her motion. See Bowman v. Songer, 820 P.2d 1110, 1112-13 (Colo.1991) (a motion to reconsider filed before final judgment is not subject to C.R.C.P. 59 ); see also C.R.C.P. 121, § 1-15(11) (governing motions to reconsider interlocutory orders). Further, the motion clearly asserted errors of law, for which no affidavit is required. C.R.C.P. 59(d)(6).

On appeal, Corona relies on Restatement (Third) of Trusts § 19 cmt. f (Am. Law Inst.2003). But we see no place in the record where she made any argument in the district court based on that provision. Therefore, we need not consider it. Estate of Stevenson v. Hollywood Bar & Café, Inc., 832 P.2d 718, 721 n. 5 (Colo. 1992) ; Valentine v. Mountain States Mut. Cas. Co., 252 P.3d 1182, 1188 n. 4 (Colo.App.2011). In any event, that provision contemplates that, even if a trust is revoked, the settlor could take measures "by will," for example, to re-establish a testamentary trust plan. The 2000 will expressly contemplates creation of a trust if the trust was not in effect on Auriel's death. Corona appears to argue this was some kind of mistake, but her argument is entirely speculative.