Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 9, 2018

**2018 CO 26**

**No. 16SC386, Sandstead-Corona v. Sandstead—Implied Trusts—Probate
Jurisdiction—§ 15-10-501, C.R.S. (2017)—No-Contest Clause.**

This case raises multiple issues arising from a dispute between two sisters

concerning their mother's estate and funds contained in a multi-party account alleged to

be non-probate assets. The supreme court concludes first that pursuant to section

13-9-103(3)(b), C.R.S. (2017), the trial court had jurisdiction to resolve the dispute over the

funds in the multi-party account and to impose a constructive trust if appropriate because

the facts presented a question as to whether the funds were part of mother's estate. The

court further concludes that the trial court properly imposed a constructive trust over

these funds because the sister who was the surviving signatory on the multi-party

account was in a confidential relationship with her mother and her sister and she abused

that relationship when she misspent the funds. Next, the court concludes that because

an implied trust is included in the fiduciary oversight statute's definition of an "estate,"

the trial court properly surcharged the sister who was the signatory on the multi-party

account because she had misused the funds in the implied trust. Finally, the court

concludes that although a no-contest clause that was contained in mother's revocable

trust was incorporated by reference into her will, by its plain language, that clause applied only to actions contesting the trust, not challenges to the will.  Accordingly, the court concludes that the trial court erred in enforcing the no-contest clause against the sister who challenged the will.

The supreme court thus reverses the judgment of the court of appeals and remands this case for further proceedings.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

### 2018 CO 26

### Supreme Court Case No. 16SC386
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA231

### Petitioner:

Shauna Sandstead-Corona,

v.

### Respondent:

Vicki J. Sandstead.

### Judgment Reversed
*en banc*
April 9, 2018

**Attorneys for Petitioner**
David F. Steinhoff
R. Eric Solem
 *Englewood, Colorado*

**Attorneys for Respondent:**
The Law Offices of Peter R. Bornstein
Peter R. Bornstein
 *Greenwood Village, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

¶1 This case involves a dispute between two sisters, Shauna Sandstead-Corona ("Corona") and Vicki Jo Sandstead ("Sandstead"), over how to divide their mother Auriel Sandstead's ("Auriel's") estate. Prior to her death, Auriel placed proceeds from the sale of the family's farm into a multi-party bank account (the "Wells Fargo Account") on which Sandstead and Corona were also signatories, with the intent that the money would transfer to Sandstead and Corona outside of probate upon Auriel's death. With Auriel's permission, Sandstead later moved a large portion of the funds into different bank accounts (the "Citizens Bank Accounts") that Corona could not access. Auriel subsequently died, and the court appointed Sandstead as the personal representative of Auriel's probate estate. Corona then filed a motion to surcharge Sandstead for, as pertinent here, her use of the funds that Sandstead had removed from the Wells Fargo Account and placed in the Citizens Bank Accounts.

¶2 The Logan County District Court, acting in its capacity as probate court in this proceeding, conducted a trial on Corona's surcharge motion and determined that Sandstead's custody of the funds prior to filing a probate proceeding was "in the nature of an implied trust." The court further concluded that Sandstead had failed to account properly for the funds, thus warranting a surcharge for the unaccounted amounts.

¶3 In the course of the above-described probate proceeding, a pour-over will and related revocable trust executed by Auriel and her late husband were discovered. Corona contested the will and trust on the ground that Auriel and her husband had revoked the trust. The trial court rejected this contention, however, and further concluded that under

2

the trust's no-contest clause, because Corona had contested the will and trust, she forfeited all property that she would have inherited under the will.

¶4 Both Sandstead and Corona appealed, and in a published decision, a split division of the court of appeals concluded that the trial court had erred in surcharging Sandstead for her use of the farm proceeds. The division majority reasoned that the funds at issue were not part of the probate estate. Rather, they passed to Sandstead alone under the probate code's multi-party account statute. Therefore, the surcharge was inappropriate. The division also affirmed the trial court's determination regarding the no-contest clause.

¶5 Corona petitioned for certiorari, and we granted the petition to consider (1) whether an implied trust could be imposed on the farm proceeds that Sandstead had placed in the Citizens Bank Accounts; (2) whether the fiduciary oversight statute in the probate code permitted the trial court to sanction Sandstead for actions taken prior to Auriel's death and prior to Sandstead's appointment as personal representative of Auriel's estate; (3) whether the trial court erred in applying the no-contest clause in the trust to Corona's challenge to the pour-over will; and (4) whether Corona had probable cause to contest the will.[1]

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether the court of appeals erred in reversing the district court's finding that an implied trust had been created.

2. Once the district court obtained jurisdiction over a personal representative, whether the fiduciary oversight statute at section 15-10-501, C.R.S. (2016), permits the district court to sanction the personal representative for wrongful conduct in administering a

3

¶6     We now reverse the division's ruling. As a preliminary matter, we conclude that pursuant to section 13-9-103(3)(b), C.R.S. (2017), the trial court had jurisdiction to resolve the present dispute because the dispute presented a question as to whether the funds that Sandstead had placed in the Citizens Bank Accounts were part of Auriel's probate estate. Turning then to the issues presented, we conclude first that the trial court properly imposed an implied trust over at least a portion of the farm proceeds. Specifically, when Sandstead moved the funds from the Wells Fargo Account to the Citizens Bank Accounts, she was in a confidential relationship with her mother and Corona. When she then misspent those funds, she abused that confidential relationship, thereby justifying the imposition of an implied trust.

¶7     We further conclude that because an implied trust is included in the fiduciary oversight statute's definition of an "estate," the trial court could properly surcharge Sandstead for her malfeasance as to the funds in the implied trust.

¶8     Finally, we conclude that although the no-contest clause in the trust was incorporated by reference into the will, by its plain language, that clause applies only to actions contesting the trust, not challenges to the will. Accordingly, we conclude that the

decedent's financial affairs prior to the decedent's death and prior to her appointment as personal representative.

3. Whether the court of appeals erred in affirming the district court's extension of a no-contest clause from a trust into an accompanying pour-over will.

4. Whether decedent's attempt to revoke her revocable trust constituted probable cause for a beneficiary to challenge not just the trust but also its companion pour-over will.

4

trial court erred in enforcing the no-contest clause against Corona based on her actions contesting the will.

¶9     We therefore reverse the division's judgment, and we need not reach the final issue on which we granted certiorari.

## I.  Facts and Procedural History

¶10    The pertinent facts of this case are lengthy and complex.  We begin by tracing the facts leading to the present probate proceeding.  We then provide the facts necessary to understand the dispute over Sandstead's handling of the funds in the Citizens Bank Accounts.  Next, we review the facts related to the dispute over the no-contest clause. Finally, we discuss the parties' appeals of the trial court's pertinent orders.

## A.  Events Leading to this Probate Proceeding

¶11    Auriel and her husband Willard had three daughters, Corona, Sandstead, and Margo Mesch.  Mesch is not involved in this case.

¶12    In 1991, Auriel executed a will (the "1991 Will"), naming Willard as her heir and Sandstead and Corona as the residuary beneficiaries.

¶13    In 2000, Auriel executed a second will (the "2000 Will") and, along with Willard, a related revocable living trust (the "Trust").  Willard and Auriel placed three parcels of property into that Trust: (1) their house in Sterling, Colorado; (2) their condominium in Florida; and (3) a parcel of land from the family farm.  Under the terms of the Trust, upon the death of both Willard and Auriel, the assets of the Trust were to be divided 40% to Sandstead, 40% to Corona, and 20% (10% each) to Mesch's two sons.  The 2000 Will also named the Trust as the residuary beneficiary of Auriel's estate.

5

¶14 In 2000, Willard began arranging to sell the family's farm, and the sale was completed shortly after he died in 2007. At the suggestion of Willard and Auriel's attorney, the proceeds from the sale were deposited into the Wells Fargo Account, which was a multi-party account with Willard, Auriel, Sandstead, and Corona as joint signatories. The parties do not appear to dispute that Auriel placed the funds into the Wells Fargo Account to avoid having those funds pass through probate on her death.

¶15 Thereafter, and while Auriel was still alive, Sandstead moved approximately $200,000 from the Wells Fargo Account to the Citizens Bank Accounts, which were located in Boston, where Sandstead lives. Corona was not a signatory on any of the Citizens Bank Accounts. Rather, only Sandstead, and in some cases Auriel, was a signatory on those accounts. According to Sandstead, Auriel agreed to allow Sandstead to move the money to the Citizens Bank Accounts, and Sandstead understood that the money was to be used for Auriel's care until her death, after which it would be split equally between herself and Corona. Corona likewise understood that she was to be entitled to one-half of the money in the Citizens Bank Accounts after Auriel's death.

¶16 Auriel died in late 2007. Thereafter, Sandstead and Corona met with their parents' lawyer to sign a small estate affidavit, representing that the value of the estate was less than $50,000. At the time the sisters signed this affidavit, they believed that because the farm proceeds had been transferred to the joint bank accounts, Auriel's estate consisted solely of a car and certain personal property.

6

¶17 Sandstead and Corona subsequently began to disagree about matters relating to their parents' assets. Corona also began to ask Sandstead for her half of the money that had been held in the Citizens Bank Accounts.

¶18 About a year later, Sandstead initiated the present probate proceeding because she believed that items were missing from Auriel's estate. Sandstead lodged the 1991 Will with the trial court (apparently because she was unaware at that time of the 2000 Will), and the registrar signed an order appointing her as the personal representative of Auriel's estate. Thereafter, Sandstead opened an estate account at Citizens Bank and transferred the funds in the Citizens Bank Accounts that were in her name into the estate account.

## B. Corona's Surcharge Motion

¶19 About a year after Sandstead opened the probate estate, Corona filed a petition to remove Sandstead as personal representative, alleging that Sandstead had misadministered Auriel's estate in a number of ways. Rather than litigate this petition, Sandstead resigned as personal representative, and she and Corona agreed to the appointment of a successor personal representative.

¶20 Subsequently, the successor personal representative filed, and the trial court granted, a motion requiring Sandstead to provide a detailed accounting. After Sandstead filed the requested accounting, Corona filed a motion for surcharge and other relief against Sandstead.

¶21 The trial court held a bench trial on Corona's surcharge motion and ultimately issued an order finding that Sandstead had improperly accounted for and unnecessarily spent funds (1) before Auriel's death, (2) after Auriel's death but before Sandstead's

7

appointment as personal representative, and (3) after Sandstead's appointment. The trial court thus concluded that Sandstead held the farm proceeds in an implied trust. In addition, the trial court concluded that because Sandstead had treated the funds in the Citizens Bank Accounts as estate property, she had made a judicial admission that she did not claim those funds individually. Finally, the court found that it did not have sufficient information to decide whether to surcharge Sandstead for certain transactions. The court thus ordered the successor personal representative to conduct an accounting as to those transactions.

¶22 Sandstead moved for reconsideration of the court's order and for a new trial. As pertinent here, she asserted that the trial court (1) could not surcharge her for actions predating her appointment as personal representative, (2) did not have jurisdiction over the funds in the Citizens Bank Accounts until Sandstead transferred the remaining funds to the estate, and (3) incorrectly determined that Sandstead's placement of the funds in an estate account constituted a judicial admission. The trial court denied this motion.

¶23 Corona then filed a motion for final surcharge, which the trial court granted in substantial part.

### C. Corona's Challenge to the 2000 Will and Trust

¶24 Some time after the above-described surcharge hearing, the 2000 Will and the Trust were discovered. Thereafter, Sandstead filed a petition for formal probate of the 2000 Will and a motion to determine the validity of the Trust. Corona, however, challenged the validity of the two instruments because of a written Trust revocation signed by both Willard and Auriel. She argued that the Trust revocation effectively

8

revoked Willard and Auriel's entire 2000 estate plan, including the 2000 Will.

¶25 The trial court held a hearing on the validity of the 2000 Will and the Trust and ultimately found that Willard and Auriel did not validly revoke the Trust. In support of this ruling, the court reasoned that at the time of the revocation, Willard and Auriel were suffering from impaired functioning and had not received sufficient information from their attorney to provide them with an adequate understanding of the nature and effect of their acts. The court further found that the 2000 Will was valid because Willard and Auriel did not revoke it in one of the two permitted ways under section 15-11-507, C.R.S. (2017).

¶26 Subsequently, Sandstead and her two nephews, Robert and Karry Mesch, filed a motion to enforce a no-contest clause contained in the Trust. This clause provided that if any beneficiary of the Trust contested or disputed the validity of the Trust or any of its provisions, then the Trust settlors (Willard and Auriel) would revoke absolutely the gift or provision for that person and declare any such gift or provision void. The Trust was incorporated by reference, in its entirety, into the 2000 Will.

¶27 Sandstead and her nephews argued that because Corona had contested the validity of the Trust, she could no longer benefit from it. Corona responded, however, that the no-contest clause was unenforceable because she had probable cause to challenge both the 2000 Will and the Trust.

¶28 The trial court ultimately ruled that Corona had probable cause to challenge the Trust but not the 2000 Will and, therefore, Corona was barred from receiving gifts or provisions from the estate or any testamentary trust.

9

## D. Cross-Appeals

¶29 Sandstead appealed the trial court's surcharge orders, arguing, as pertinent here, that the court had erred in surcharging her for her use of the farm proceeds. She asserted that (1) she had no fiduciary relationship with either her mother or her sister that could have given rise to an implied trust and (2) the proceeds from the farm passed outside of probate pursuant to the multi-party account statute, §§ 15-15-201 to -227, C.R.S. (2017), and therefore were not part of the probate estate. Sandstead also argued that the trial court had erred in finding that her placement of the farm proceeds in an estate bank account constituted a judicial admission that the funds were part of the estate.

¶30 Corona responded that the trial court had properly determined that an implied trust was created over the farm proceeds when Sandstead moved those proceeds to the Citizens Bank Accounts. She further asserted that the trial court had the authority to surcharge Sandstead for her actions because Sandstead had submitted to the jurisdiction of the trial court when she filed the probate proceeding and thus could not question that court's jurisdiction, which she herself had invoked.

¶31 In addition, Corona cross-appealed the trial court's decision enforcing the no-contest clause. She contended that (1) the clause did not apply to the 2000 Will and (2) even if it did apply, Corona had probable cause to contest the 2000 Will.

¶32 Sandstead responded to the cross-appeal, arguing that the trial court had properly concluded that the no-contest clause applied to the 2000 Will because the 2000 Will incorporated the clause by reference and the facts before the trial court did not support Corona's assertion that she had probable cause to contest the 2000 Will.

10

¶33 In a split, published decision, a division of the court of appeals concluded that the trial court had erred in surcharging Sandstead for actions taken concerning the funds in the Citizens Bank Accounts. In re Estate of Sandstead, 2016 COA 49, ¶ 54, 412 P.3d 799, 808–09. As pertinent here, the majority determined that by operation of law, the money in the Citizens Bank Accounts belonged to Sandstead alone and that the estate had no claim to that money. Id. at ¶¶ 36, 54, 412 P.3d at 806, 808–09. In reaching this conclusion, the majority further determined that Sandstead's placement of the funds in an estate account did not constitute a judicial admission. Id. at ¶ 42, 412 P.3d at 806–07. And the majority concluded that the trial court's enforcement of the no-contest clause against Corona was proper, agreeing that the clause was incorporated into the 2000 Will and that Corona did not have probable cause to contest the 2000 Will. Id. at ¶¶ 68−69, 76, 412 P.3d at 811–12.

¶34 Judge Taubman concurred as to the no-contest clause but disagreed with the majority's conclusion that the trial court had improperly surcharged Sandstead for actions taken regarding the Citizens Bank Accounts. Id. at ¶ 125, 412 P.3d at 819 (Taubman, J., concurring in part and dissenting in part). In Judge Taubman's view, the trial court had properly concluded that (1) Sandstead did not "own" the money in the Citizens Bank Accounts but rather was an agent with respect to those funds and (2) the Citizens Bank Accounts were agency or trust accounts that were not subject to the multi-party account statute. Id. at ¶ 123, 412 P.3d at 819. Judge Taubman also concluded that Sandstead's actions and statements that the funds in the Citizens Bank estate account

11

were estate property constituted judicial admissions, even if Auriel had not intended that the funds in those accounts be part of her estate. Id. at ¶ 115, 412 P.3d at 818.

¶35  Corona petitioned this court for certiorari review, and we granted that petition.

## II. Analysis

¶36  We begin by addressing the applicable standard of review. We then turn to the trial court's jurisdiction to impose an implied trust, given Sandstead's assertions that the assets at issue were not part of the probate estate and that therefore, the court lacked jurisdiction over the dispute regarding those assets. After concluding that the trial court had jurisdiction, we proceed to discuss the law of implied trusts and determine that the trial court properly found that such a trust could be imposed in the circumstances presented. We then examine the trial court's authority to surcharge Sandstead for the actions that she took prior to her appointment as personal representative and conclude that the court had such authority here. Finally, applying established principles of contractual interpretation, we construe the no-contest clause and conclude that that clause did not apply to Corona's challenge to the 2000 Will.

## A. Standard of Review

¶37  "When a court enters a judgment following a bench trial, that judgment presents a mixed question of law and fact." State Farm Mut. Auto. Ins. Co. v. Johnson, 2017 CO 68, ¶ 12, 396 P.3d 651, 654. "We apply a bifurcated standard to such questions, reviewing the evidentiary factual findings for an abuse of discretion and the legal conclusions de novo." Id.; see also E-470 Pub. Highway Auth. v. 455 Co., 3 P.3d 18, 22−23 (Colo. 2000) (noting that when the issue before an appellate court presents a mixed question of law

12

and fact, the court may treat the ultimate conclusion as one of fact and apply a clear error standard, it may conclude that a mixed question of fact and law demands de novo review, or it may review the findings of fact for clear error and the legal conclusions de novo, but ultimately deciding to apply an abuse of discretion standard to review the trial court's evidentiary findings of fact in support of its application of a legal principle from other jurisdictions).

¶38 In addition, this case requires us to interpret the pertinent statutes, as well as the Trust and the 2000 Will. We review such issues de novo. UMB Bank, N.A. v. Landmark Towers Ass'n, 2017 CO 107, ¶ 22, 408 P.3d 836, 840 (noting that the supreme court reviews issues of statutory interpretation de novo); Denver Found. v. Wells Fargo Bank, N.A., 163 P.3d 1116, 1122 (Colo. 2007) ("[A]bsent ambiguity, interpretation of a trust is a question of law that we review de novo.").

¶39 In construing a statute, "we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings." UMB Bank, ¶ 22, 408 P.3d at 840. If the statutory language is clear, we apply it as written and need not resort to other rules of statutory construction. Id. Our ultimate goal is to effectuate the legislature's intent. See St. Vrain Valley Sch. Dist. RE-1J v. Loveland, 2017 CO 54, ¶ 11, 395 P.3d 751, 754.

## B. Jurisdiction to Impose Implied Trust

¶40 Before addressing whether the trial court's conclusion that the farm proceeds in the Citizens Bank Accounts were subject to an implied trust, we must first address the

13

trial court's jurisdiction to decide that question, given Sandstead's contention that the assets at issue are non-estate assets and therefore were not subject to the court's jurisdiction.

¶41    A district court sitting in probate "has jurisdiction over all subject matter vested by article VI of the [Colorado] constitution and by articles 1 to 10 of title 13, C.R.S." § 15-10-302(1), C.R.S. (2017).  The court thus has the authority

> to impose or raise a trust with respect to any of the property of the decedent or any property in the name of the decedent, individually or in any other capacity, in any case in which the demand for such relief arises in connection with the administration of the estate of a decedent.

§ 13-9-103(3)(b), C.R.S. (2017); see also In re Estate of Lembach, 622 P.2d 606, 607 (Colo. App. 1980) ("Since all probate courts may exercise subject matter jurisdiction vested by articles 1 through 10 of title 13, the specific enumeration of the Denver Probate Court's subject matter jurisdiction is applicable to all district courts sitting in probate matters.").

¶42    The phrase "in connection with" is commonly understood to contemplate a logical and contextual relationship or association exhibiting "coherence" or "continuity."  See People v. Baer, 973 P.2d 1225, 1230 (Colo. 1999).  Applying this definition in the context of a probate court's jurisdiction, a division of the court of appeals interpreted the phrase "in connection with" to authorize the court to resolve disputes logically relating to the estate, even when the disputes involve non-probate assets.  See In re Estate of Owens, 2017 COA 53, ¶¶ 13–17, ___ P.3d ___ (concluding that the district court sitting in probate had jurisdiction to impose a constructive trust on funds in payable-on-death bank accounts because resolving the issues surrounding those assets was essential to the

14

proper and orderly administration of the decedent's estate). Divisions of the court of appeals have thus consistently determined that questions over whether property is part of an estate vests a probate court with jurisdiction to impose a constructive trust over such property pursuant to section 13-9-103. See id. at ¶¶ 16−17; see also In re Estate of Murphy, 195 P.3d 1147, 1151–52 (Colo. App. 2008) (concluding that the probate court had jurisdiction over a party's petition to partition certain real property, notwithstanding the fact that the parties disputed whether the property at issue was property of the estate, because resolving the questions of title presented by the petition was essential to the proper, orderly distribution of estate property).

¶43  Here, the farm proceeds at issue at least initially belonged to Auriel, and the present dispute over the funds is logically related to Auriel's estate. See Owens, ¶¶ 13−17. Moreover, as the record reflects, this case raised questions as to whether the funds at issue came into Auriel's estate through the 2000 Will and the Trust or whether they remained outside the probate estate because they passed by operation of law to Sandstead via the multi-party account statute or to Sandstead and Corona via an implied trust. Because the resolution of these issues was essential to the proper and orderly administration of Auriel's estate, we conclude that the trial court, sitting in probate, had jurisdiction to decide these questions and, if necessary, to impose an implied trust on the assets at issue. See id.; Murphy, 195 P.3d at 1151–52. We thus turn to whether the imposition of an implied trust was warranted on the facts presented.

15

## C. Implied Trust

¶44    Colorado recognizes two kinds of implied trusts: resulting and constructive trusts. Page v. Clark, 592 P.2d 792, 797–98 (Colo. 1979). Resulting trusts have loosely been classified as "intent-enforcing." See Shepler v. Whalen, 119 P.3d 1084, 1089 (Colo. 2005). These generally arise in three situations: (1) when an express trust fails in whole or in part; (2) when an express trust is fully performed without exhausting the trust estate; and (3) when property is purchased and the purchase price is paid by one person and, at that person's direction, the vendor conveys the property to another person. Page, 592 P.2d at 797. In each of these situations, the facts give rise to an inference that the person taking title to the property is not intended to have the beneficial interest. Id.

¶45    In contrast, a constructive trust is a "remedial device designed to prevent unjust enrichment." Mancuso v. United Bank of Pueblo, 818 P.2d 732, 737 (Colo. 1991). Constructive trusts "are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." Page, 592 P.2d at 798 (quoting Botkin v. Pyle, 14 P.2d 187, 191 (Colo. 1932)). "The doctrine of constructive trusts is extremely flexible." Mancuso, 818 P.2d at 737.

¶46    This court has observed that a constructive trust can arise when two parties have a "confidential relationship" that caused one party to act less vigilantly than he or she would have done had he or she been dealing with a stranger. See Page, 592 P.2d at 798. In particular, we have recognized that confidential relationships often arise between close family members. See Lewis v. Lewis, 189 P.3d 1134, 1142–43 (Colo. 2008) ("Claims

16

arising between close family members or confidants, where one party reasonably relies on the assertions of another in absence of a written document stems [sic] from a confidential relationship between the parties."). We have also noted that a confidential relationship may arise when one party has justifiably reposed confidence in another, but for such a relationship to arise from a transfer of property, the transferor must be justified in his or her belief that the transferee will act in the transferor's interests. Page, 592 P.2d at 798.

¶47 Once a party demonstrates that a confidential relationship exists, a transaction may be set aside if that relationship has been abused. Id. A party can demonstrate an abuse of the confidential relationship by showing, for example, that the party who possesses the property at issue refused to act in accordance with the parties' mutual intent. See id. ("The refusal to perform the promise to reconvey is itself a sufficient abuse of confidence to allow the conveyance to be set aside."); Lewis, 189 P.3d at 1143 ("[W]hen close family members or confidants act with a mutual purpose, unjust enrichment occurs when one party benefits from an action that is a significant deviation from that mutual purpose."). In such circumstances, the imposition of a constructive trust may be proper because when property has been acquired in circumstances in which the holder of legal title may not in good conscience retain the beneficial interest, equity converts the holder into a trustee. Page, 592 P.2d at 798.

¶48 When grounds exist for the imposition of a constructive trust, the trust is deemed to exist as of the date of the wrongful acquisition, with the acquirer treated as a trustee from that date. See id.; see also Mt. Sneffels Co. v. Estate of Scott, 789 P.2d 464, 467 (Colo.

17

App. 1989) ("A constructive trust in the sale proceeds from the land that was mistakenly omitted from the buyer's deed was created by operation of law at the moment of conveyance to the third-party bona fide purchaser."); Caryl A. Yzenbaard, George Gleason Bogert & George Taylor Bogert, Bogert's Trusts & Trustees § 472 (2017) ("Most courts take the position that the constructive trust arises at the time the property is wrongfully acquired.").

¶49 Notably, at least one division of the court of appeals has applied the foregoing principles to impose a constructive trust when, as here, a parent placed property in joint tenancy with one child with the understanding that the child would share the property with his or her siblings after the parent died. See Weeks v. Esch, 568 P.2d 494, 495 (Colo. App. 1977). In Weeks, a mother, in an attempt to avoid probate, transferred ownership of all of her property, real and personal, to herself and her daughter, in joint tenancy. Id. The mother later sold one property and despite the title interest of the daughter, divided the proceeds from that sale equally among herself and all of her children. Id. Thereafter, and just days before her mother's death, the daughter, allegedly at the mother's direction, withdrew the funds on deposit in certain joint bank accounts and deposited those funds into her own account. Id. The daughter's siblings subsequently challenged these actions, and the trial court ultimately found that the mother had transferred her property to the daughter intending for the daughter to divide that property equally among all of the children. Id. The trial court also found that a confidential relationship existed between the mother and daughter and, accordingly, ruled that the daughter held the property under a constructive trust. Id. The daughter appealed, contending that the necessary

elements of a constructive trust had not been established, but the division rejected this argument, concluding that the trial court had properly determined that a confidential relationship existed between the mother and daughter, thereby justifying the imposition of a constructive trust. Id. at 495−96.

¶50 Turning to the facts of this case, we note initially that the record reveals some confusion as to whether the farm proceeds at issue were assets of the probate estate. The trial court appears to have concluded that they were, either because of Sandstead's purported judicial admissions (by treating the funds as estate assets) or due to the operation of the 2000 Will and the Trust. The division majority, however, disagreed with this conclusion, determining that the assets passed outside the estate, by operation of the multi-party account statute. Sandstead, ¶ 36, 412 P.3d at 806. Although for the reasons discussed below, the trial court will need to revisit this issue on remand, the resolution of this question does not preclude us from addressing the implied trust issue because we conclude that the funds at issue are subject to a constructive trust regardless of whether they are estate assets.

¶51 Specifically, assuming without deciding that the farm proceeds at issue are not part of the probate estate, we conclude that a confidential relationship existed between Auriel and Corona, on the one hand, and Sandstead, on the other, when Sandstead moved the funds from the Wells Fargo account, where Corona was an account holder, to the Citizens Bank Accounts, where she was not. Sandstead agrees that the transferred funds belonged to Auriel until her death and thereafter were to be equally owned by Sandstead and Corona. Moreover, the record amply supports the existence of a

19

confidential relationship among the parties because they were close family members who reasonably relied on each other to carry out their mutual intent even absent a written agreement. See Lewis, 189 P.3d at 1142−43. And the record further supports the trial court's finding that Sandstead abused this confidential relationship by misspending a portion of the funds in the Citizens Bank Accounts, contrary to Auriel and Corona's interest in the funds. Accordingly, assuming without deciding that the funds at issue were non-probate assets, we conclude that the trial court properly imposed an implied trust on those funds. See Page, 592 P.2d at 798.

¶52 Even if the farm proceeds at issue were probate assets, however, we would reach the same conclusion. In that scenario, whether or not Sandstead knew that she was holding the funds on behalf of Auriel's estate, she indisputably knew that she was holding them for someone other than herself, whether her mother, her mother's estate, Corona, or any other heirs. Accordingly, in our view, the analysis set forth above with respect to the funds as non-probate assets applies here with equal force. Specifically, Sandstead was in a confidential relationship with the other parties who had an interest in the funds at issue, and she abused that relationship by misspending those funds, contrary to the other parties' interests. Thus, for the reasons set forth above, we perceive no error in the trial court's decision to impose an implied trust on those funds. See Mancuso, 818 P.2d at 737; Page, 592 P.2d at 798.

¶53 In this regard, we believe that Weeks is substantially on point. As noted above, in Weeks, a division of the court of appeals affirmed the imposition of a constructive trust in a factual scenario that was nearly identical to that at issue here, in which an intended

20

heir had removed funds from a joint bank account when the funds were intended to be divided among all of the decedent's intended heirs. Weeks, 568 P.2d at 496. We agree with that division's analysis and conclude that it supports the result that we reach here.

¶54 We are not persuaded otherwise by the division majority's conclusion that because the funds were in a multi-party account, they passed to Sandstead alone pursuant to section 15-15-212(1) and therefore, an implied trust was unwarranted. Sandstead, ¶ 36, 412 P.3d at 805. The multi-party account statute provides, in pertinent part, "[O]n death of a party [to a multi-party account] sums on deposit in a multiple-party account belong to the surviving party or parties." § 15-15-212(1). The multi-party account statute does not apply, however, to "a fiduciary or trust account in which the relationship is established other than by the terms of the account." § 15-15-202 (emphasis added). Here, for the reasons set forth above, the funds in the Citizens Bank Accounts comprised a fiduciary or trust account, namely, a constructive trust by which Sandstead held the funds at issue in trust for Corona. Moreover, the relationship created by this trust account was not created by the terms of the multi-party account itself. Rather, the trust account was established in equity. Accordingly, by its express terms, the multi-party account statute does not apply. See id.

## D. Trial Court's Ability to Surcharge

¶55 We next address Sandstead's contention that sections 15-10-501 to -505, C.R.S. (2017) (the "fiduciary oversight statute"), did not authorize the trial court to surcharge her for actions that she took prior to becoming the personal representative of her mother's estate. We disagree.

21

¶56 The fiduciary oversight statute grants district courts sitting in probate the authority to oversee the actions of fiduciaries over whom the courts have obtained jurisdiction. § 15-10-501(1). For purposes of this statute, "jurisdiction" is defined as "the personal jurisdiction obtained by a court over a fiduciary as a result of the filing of a proceeding concerning the estate." § 15-10-501(2)(c). Although the term "fiduciary" as used in this statute is not defined, section 15-10-501(3) of the probate code cites a trustee as an example of a fiduciary. The term "estate," in turn, is defined to include both estates of a decedent and implied trusts. § 15-10-501(2)(b).

¶57 In addition, section 15-10-504(2)(a) of the probate code authorizes a district court sitting in probate to review a fiduciary's conduct and to surcharge and sanction the fiduciary upon a breach of fiduciary duty or an improper exercise of his or her power. Specifically, if a court determines that a breach of fiduciary duty has occurred or an exercise of power by a fiduciary has been improper, then the court may surcharge the fiduciary for any damage or loss to the estate, beneficiaries, or interested persons. Id.

¶58 Applying these principles here, we conclude first that the trial court obtained jurisdiction over Sandstead as a result of her filing this probate proceeding and obtaining an order appointing her as personal representative of the estate. See § 15-10-501(1). In addition, as noted above, the trial court had the authority to impose an implied trust on the funds contained in the Citizens Bank Accounts, and because the funds in the Citizens Bank Accounts comprised such a trust, those funds fall within section 15-10-501(2)(b)'s definition of an "estate." Finally, because Sandstead was a constructive trustee of the implied trust at issue, she qualifies as a "fiduciary" pursuant to section 15-10-501(3) and

22

thus was properly subject to surcharge under the fiduciary oversight statute. See § 15-10-504(2).

## E. No-Contest Clause

¶59 Having decided that the trial court had the authority to surcharge Sandstead for her actions regarding the funds in the Citizens Bank Accounts, we must consider whether the division erred in affirming the trial court's application of the no-contest clause to the 2000 Will, which resulted in the forfeiture of Corona's share of Auriel's estate. Corona argues that although the Trust's no-contest clause was incorporated into the 2000 Will, the plain language of that clause only prohibits a challenge to the Trust. We agree.

¶60 "A writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification." § 15-11-510, C.R.S. (2017). In construing a will, a court ascertains and gives effect to the testator's intent as expressed in the will. Christopher v. Cole, 196 P.2d 988, 989 (Colo. 1948). In ascertaining this intent, "words and phrases used therein must be given their familiar, usual and generally accepted meaning." In re Gabriel's Estate, 227 P.2d 344, 345 (Colo. 1951). Additionally, no-contest clauses in wills "are to be strictly construed, and forfeiture is to be avoided if possible." In re Estate of Peppler, 971 P.2d 694, 696 (Colo. App. 1998).

¶61 Here, the parties agree that the following clause in the 2000 Will incorporates the Trust by reference into the 2000 Will:

> I give my residuary estate . . . to the trustee of THE WILLARD AND AURIEL SANDSTEAD REVOCABLE TRUST, dated July 25, 2000, . . . to be added to the property of the Trust and disposed of in accordance with its

23

terms and any amendments prior to my death. If the Trust, <u>which I specifically and completely incorporate in this will by reference</u>, is not in effect at my death, I direct my personal representative to establish a trust in accordance with the provisions of the Trust and I give my residuary estate . . . to the trustee of such trust.

(Emphasis added.)

¶62 The question thus becomes whether the Trust's no-contest clause, incorporated into the 2000 Will, precludes a challenge to the will.

¶63 The no-contest clause provided:

If any beneficiary of this Trust, other than a Settlor, directly or indirectly shall contest or dispute the validity <u>of this Trust</u>, or any of its provisions, or any amendments thereto, including the dispositions made or provided herein, . . . or maintains before any judicial body that this is not a <u>valid Trust</u>, or seeks to cancel or avoid any of the provisions <u>of this Trust</u>, then the Settlors revoke absolutely the gift or provision for that person herein contained and declare any such gift or provision void.

(Emphases added.)

¶64 Strictly construing this provision to avoid forfeiture if possible, <u>id.</u>, we conclude that the plain terms of the provision bar only a challenge to the Trust and not to the 2000 Will. The no-contest clause nowhere mentions the 2000 Will, and we see nothing in the 2000 Will's incorporation clause to alter the language of the no-contest clause so as to render it applicable to the 2000 Will.

¶65 Accordingly, we conclude that the division erred in affirming the trial court's application of the no-contest clause to the 2000 Will and in therefore concluding that Corona's challenge to the 2000 Will resulted in the forfeiture of her share of Auriel's estate.

24

¶66 In light of this disposition, we need not consider whether probable cause supported Corona's challenge to the 2000 Will.

### III. Issues on Remand

¶67 For the foregoing reasons, we conclude that the division erred in determining that (1) the trial court had erroneously imposed an implied trust on the funds at issue and (2) Corona had forfeited her interest in Auriel's estate by challenging the 2000 Will in violation of the no-contest clause. Accordingly, we reverse the division's judgment and remand this case for further proceedings.

¶68 Because the question is likely to arise on remand, we briefly address Sandstead's contention that the trial court erred in concluding that the assets at issue were estate assets based on purported judicial admissions by Sandstead. We agree with Sandstead and the division majority below that Sandstead's statements and actions did not constitute judicial admissions that the funds were part of Auriel's probate estate.

¶69 "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo. 1986). The judicial admission doctrine "only applies to pro-forma factual matters—it does not pertain to contested issues of law." People v. McKimmy, 2014 CO 76, ¶ 17, 338 P.3d 333, 338. Here, the question of whether the farm proceeds passed into Auriel's probate estate through the 2000 Will or the Trust is a question of law and therefore cannot be the subject of a judicial admission. See Meier v. Denver U.S. Nat'l Bank, 431 P.2d 1019, 1021 (Colo. 1967) ("The construction of a written

25

instrument [is] a question of law . . . ."); <u>Denver Found.</u> 163 P.3d at 1122 ("[A]bsent ambiguity, interpretation of a trust is a question of law that we review de novo.").

¶70 In light of this determination, on remand, the trial court will need to revisit whether all or a portion of the proceeds from the farm passed through either the 2000 Will or the Trust, or whether any of such proceeds passed to Sandstead and Corona outside of the probate estate. The determination of this question is important because if the assets pass under the 2000 Will or the Trust, then they would be divided 40% to Sandstead, 40% to Corona, and 20% to Mesch's children. If, however, these assets pass outside of the probate estate, then they would be divided equally between Corona and Sandstead. We express no opinion on these matters.

## IV. Conclusion

¶71 For these reasons, we conclude that (1) the trial court properly imposed an implied trust on the funds in the Citizens Bank Accounts; (2) the trial court acted within its authority when it surcharged Sandstead for her improper administration of the funds in the implied trust; and (3) the no-contest clause in the Trust did not prevent Corona from contesting the 2000 Will.

¶72 Accordingly, we reverse the division's judgment and remand this case to that court with instructions that the case be returned to the trial court for further proceedings consistent with this opinion.

26