23CA2233 Estate of Huffer 02-27-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2233
El Paso County District Court No. 21PR31440
Honorable Vincent N. Rahaman, Magistrate

---

In re the Estate of Karin D. Huffer, deceased.

Jason Huffer,

Appellant,

v.

Jordan Huffer,

Appellee.

---

ORDER AFFIRMED AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE GROVE
Harris and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 27, 2025

---

Semler & Associates, P.C., R. Parker Semler, Andrew Oh-Willeke, James L. French, Denver, Colorado, for Appellant

Olsen & Mahoney, LLP, Andrea N. Mahoney, Glendale, Colorado; Brunette Law Office, LLC, Stephen A. Brunette, Colorado Springs, Colorado, for Appellee

¶ 1    In this probate case, Jason Huffer (Jason) appeals the probate court's order that granted the petition of Jordan Huffer (Jordan) to invalidate the trust of decedent, Karin Huffer (Karin), on the grounds that Jason unduly influenced the amended trust.[1] We affirm.

## I.    Background

¶ 2    Viewed in the light most favorable to the probate court's ruling, the evidence presented showed the following facts.

¶ 3    Jason and Jordan are half-brothers and Karin's only children. In 1999, Karin was diagnosed with breast cancer, which recurred several times over the following two decades. Around 2007, Karin moved from Florida to Colorado Springs. Sometime between 2012 and 2014, Jason and family friend Jorge Medina[2] began living with Karin in her Colorado Springs home. Jordan remained in Florida.

---

[1] Because both parties and the decedent share the same surname, we refer to them by their first names throughout this opinion. We mean no disrespect by doing so.

[2] As the probate court described it, Medina "initially was a therapy client of Karin's and that relationship developed into a personal/business partner setup where Karin provided therapy to [Medina], while he helped Karin with [her business] and household duties."

¶ 4     Jason "essentially stopped working in 2014 and devoted the majority of his time to helping [Karin] with [her business]."  Jordan, meanwhile, "was never really involved in the running/operations of the entity."

¶ 5     In August 2017, Karin executed a trust (the 2017 trust) that equally divided her estate between Jason and Jordan — except for her business, which was to go to Jason.  In the spring of 2018, however, Karin contacted her attorney, Jack McQuitty, and asked to amend her trust to give most of her estate to Jason while leaving an individual retirement account to Jordan.[3]  In the ensuing months, Karin and McQuitty exchanged emails and met in person multiple times to discuss changes to the trust, with Jason transporting Karin to some of these meetings.  Karin explained to McQuitty in one August 2018 email that she wished to compensate Jason for caring for her but also said that she "[would] not disinherit [Jordan] even though he has not been involved in family or business and is territorial about his properties and businesses."

---

[3] Jordan never received this account because Karin never replaced Jason with Jordan as the beneficiary.

During this time, Karin also informed Jordan that she was working with McQuitty to alter her estate plan.

¶ 6     By October 2018, Karin's cancer had metastasized to other organs, and she was hospitalized for the final time. Karin's medical team determined during this hospitalization that treatment was no longer an option. She returned to her home where she died on October 24.

¶ 7     During her hospitalization, Karin executed a new trust (the 2018 trust) that amended the 2017 trust and "essentially gave the bulk of her estate to Jason." Between October 14 and October 17, as Jason was present in Karin's hospital room, "Karin and McQuitty exchanged approximately 20 emails and three different versions of the restated trust," with Jason alone copied on the emails. At that time, Karin was experiencing dyspnea, asthenia, anorexia, and depression but was not taking mind-altering medications. In response to Karin's indecisiveness during these email exchanges, McQuitty consistently requested specific instructions from Karin in order "to make things crystal clear re: percentages or we will see your entire estate split on litigation expenses." McQuitty also

offered to come to Karin's home to be present for her signing of the 2018 trust.

¶ 8    While still hospitalized, Karin called Jordan to inform him about her prognosis and that she would be returning home to die. Jordan immediately drove from Florida to Colorado Springs, where he stayed at Karin's home until shortly after her death.

¶ 9    Jordan arrived in Colorado Springs on October 17. After visiting Karin at the hospital that day, Jordan and Medina left to prepare Karin's home for her discharge from the hospital. After Jordan and Medina left, Jason (against McQuitty's thorough and specific advice to Karin about how to execute her amended estate plan) presented the 2018 trust to Karin. Jason was joined by attorney (and, according to some testimony, Jason's friend) Bill Rudge and notary Suzanne Smith, who witnessed Karin sign the 2018 trust and notarized the document. Jason, Rudge, and Smith left Karin's hospital room to allow her to review the document in private but did not go over the document's contents with her. Smith did, however, ask Karin if she wished to sign the document and Karin responded affirmatively.

4

¶ 10    Jordan did not learn of the 2018 trust until McQuitty informed him about an hour into Jordan's drive back to Florida following Karin's death.  Jordan subsequently initiated the probate proceedings that are now before us on appeal.  As relevant to this appeal, Jordan sought to invalidate the 2018 trust and restore the 2017 trust.

¶ 11    The probate court held hearings in March, June, and July of 2023.  Several witnesses, including Jason and Jordan, testified about Karin's testamentary capacity and the issue of undue influence.  In November 2023, the probate court issued a lengthy written order concluding that Jason exerted undue influence over Karin and granting Jordan's petition to invalidate the amended trust and reinstate the 2017 trust.  The probate court's order also made numerous factual findings, including credibility determinations.

¶ 12    Jason now appeals the probate court's order finding undue influence.

## II. Expert Testimony

¶ 13    Jason first challenges the probate court's admission of expert testimony from Sheri Gibson and the probate court's reliance upon that testimony to reach its conclusions.  We discern no error.

### A. Standard of Review and Applicable Law

¶ 14    CRE 702 governs the admissibility of expert testimony.  *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001).  Under CRE 702, a witness may be qualified to offer expert testimony based on any of five factors: knowledge, skill, experience, training, or education.  *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 690 (Colo. 1998).  "The initial determination of whether a witness is sufficiently qualified to render an expert opinion helpful to the [fact finder] is left to the sound discretion of the trial court, and may not be disturbed 'without a clear showing of an abuse of discretion.'"  *Id.* (quoting *White v. People*, 486 P.2d 4, 6 (Colo. 1971)).  A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair.  *Id.*

¶ 15    In determining admissibility of expert testimony, courts consider whether it is reliable and relevant.  *Shreck*, 22 P.3d at 70.  Such a determination includes "(1) the reliability of the scientific

principles, (2) the qualifications of the witness, and (3) the usefulness of the testimony to the [fact finder]." *Id.* The proposed testimony must also comply with CRE 403, which allows exclusion of relevant evidence whose probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulative presentation of evidence. *Shreck*, 22 P.3d at 70.

¶ 16    Expert testimony is reliable if the scientific principles underlying the testimony are reasonably reliable and the witness is qualified to opine on those principles. *Id.* at 77; *People v. Martinez*, 74 P.3d 316, 321 (Colo. 2003). Testimony is speculative, and thus not reliable under CRE 702, if the opinion has no sound scientific basis. *People v. Ramirez*, 155 P.3d 371, 378-79 (Colo. 2007). In determining whether expert testimony is reliable, it is not enough for a court to simply conclude that the testimony is "speculative"; instead, the court must consider the expert's qualifications and the scientific principles underlying the testimony. *Id.* at 379.

¶ 17    The court's inquiry should be broad, considering the totality of the circumstances. *Shreck*, 22 P.3d at 70. "The Colorado Supreme Court in *Shreck* established a liberal standard of admissibility that

would be balanced by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Est. of Ford v. Eicher*, 220 P.3d 939, 944 (Colo. App. 2008) (quoting *Shreck*, 22 P.3d at 78).

## B. Additional Facts

¶ 18 In January 2023, Gibson prepared a report for this litigation detailing her "retrospective evaluation" that was used "to reach a conclusion of the psycho-legal question of whether or not undue influence was present in the current case." At the conclusion of her report, Gibson summarized her opinion as follows:

> The facts presented offered significant indications to support [Karin]'s susceptibility to the influence of others and that furthermore, she was, in fact, being unduly influenced to amend her trust in a significant way that deviated from her original trust in 2017, awarding her son, Jason, almost her entire estate to the exclusion of her other son, Jordan, who was essentially disinherited. The lack of transparency in communication, her increased dependency on others, feelings of indebtedness, and evidence of indecisiveness in her decisional process offers strong support for my findings of undue influence. It is also my opinion that [Karin] had diminished capacity on the day of executing the Amended and Restated Trust document due to a debilitating and terminal health condition

8

requiring pharmacological treatment for pain
and marked depressed mood.

¶ 19    In a written motion, Jason moved to exclude Gibson as an expert, arguing that she was unqualified, her opinions were not sufficiently reliable to qualify for admission under CRE 702, and they would not be helpful to the fact finder because they did "nothing more than summarize evidence and weigh its credibility." Jason did not request a *Shreck* hearing.

¶ 20    At the outset of the hearing on the merits of Jordan's claims, the probate court acknowledged that Gibson's testimony was subject to CRE 702, CRE 703, and CRE 403 as those rules were applied in *Shreck* and *Ramirez*. During a lengthy discussion regarding the admissibility and scope of Gibson's proposed testimony, the court noted that it had read the parties' briefing and done some of its own research on the "issue of undue influence." And during the voir dire at the beginning of Gibson's testimony, the court explored her methodology for retrospectively assessing undue influence — confirming that the methodology she applied was peer reviewed and widely recognized. The court reserved judgment on how much weight it would give Gibson's testimony, but it found

that she was qualified to testify as an expert in the areas of geropsychology and neuropsychology and to give her opinion on undue influence and capacity.

¶ 21 Gibson testified about the report she had prepared and described the bases for her conclusion that Karin "was highly susceptible to undue influence." Specifically, Gibson emphasized the secrecy and urgency surrounding the 2018 trust, Jason's contradicted deposition testimony about being present at the hospital when Karin signed the document, the lack of independent confirmation with Karin that she understood the document she was signing, and the 2018 trust's deviation from her original estate plan.

C.     Analysis

1.     Reliability

¶ 22 As we understand it, the main thrust of Jason's argument is that Gibson's methodology was not reliable enough to qualify her as an expert under CRE 702. He asserts in particular that Gibson's methodology lacked sufficiently supportive professional literature and scientific evidence, and that she relied on models that are not directly applicable to situations in which the assessed individual is

dead. But as we have already noted, the court confirmed during voir dire that Gibson's methodology *did* rely on peer-reviewed studies and applied widely recognized guidelines, included those in the American Bar Association and American Psychological Association's *Assessment of Older Adults with Diminished Capacity: A Handbook for Psychologists* (2008). While Jason argues that these sources — and thus Gibson's opinions — were not supported by enough "empirical data" to render them sufficiently reliable for admission under CRE 702, we cannot conclude that the probate court abused its broad discretion by concluding otherwise. Indeed, the court actively and thoughtfully participated in Gibson's voir dire with the clear goal of ensuring that her methodology satisfied *Shreck*'s requirements, and after doing so it correctly applied Colorado's liberal standard of admissibility for expert testimony. *See Shreck*, 22 P.3d at 78.

¶ 23    Based on the foregoing, we conclude that the probate court satisfied its gatekeeping function and appropriately determined that Gibson's opinions were not "junk science." *See Ford*, 220 P.3d at 942 ("The purpose of a CRE 702 inquiry is to determine whether the proffered scientific evidence is reliable and relevant, and for the trial

court — acting as a gatekeeper — to prevent the admission of 'junk science.'"). Moreover, the probate court, acting as fact finder, determined the weight of Gibson's testimony only after she was subjected to vigorous cross-examination and the court had the opportunity to consider and weigh the contrary evidence. *See Shreck*, 22 P.3d at 78 (noting that any concerns that invalid scientific assertions will be admitted under Rule 702's liberal standard are mitigated by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof " (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993))). In short, nothing about the probate court's decision to admit Gibson's testimony was manifestly erroneous, and it therefore did not abuse its broad discretion to determine the admissibility of that testimony. *See Salazar v. Am. Sterilizer Co.*, 5 P.3d 357, 366 (Colo. App. 2000) (absent a showing of an abuse of discretion, a trial court's decision to allow a witness to testify as an expert will not be disturbed on appeal).

## 2. Remaining Arguments

¶ 24 Jason contends that a model that Gibson utilized for her report (the SCAM model) impermissibly "relies upon conflicting

12

California law" andwas in any event "inapplicable to a fact pattern involving a person lacking cognitive impairment who is not able to share her subjective story." Based on our review of the record, we are not entirely convinced that either argument was adequately preserved.[4] *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 22. In any event, however, we are not persuaded that these arguments bear on the admissibility of Gibson's opinions under CRE 702. Instead, they go to the weight of her testimony, which is the sole province of the fact finder. *See Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2021 COA 114, ¶ 50.

¶ 25    Jason also makes the conclusory assertion that "Gibson improperly engaged in racial and gender profiling." This is an undeveloped argument that we decline to address. *See People v. Liggett*, 2021 COA 51, ¶ 53 (we do not address undeveloped

---

[4] For example, referencing the SCAM model, Jason's motion to exclude Gibson's testimony under CRE 702 asserted that her report made "[a] mere reference to an acronym from the author of a paper whose reliability and scientific basis are not validated or discussed in the report" and argued that, as a result, Gibson's testimony lacked a "sound scientific basis." This differs from the arguments that he raises on appeal. *See Core-Mark Midcontinent Inc. v. Sonitrol Corp.*, 2016 COA 22, ¶ 26 ("To preserve an argument as to why a particular decision is appropriate, a party must timely raise that specific argument.").

arguments), *aff'd,* 2023 CO 22; *see also Castillo v. Koppes-Conway,* 148 P.3d 289, 291 (Colo. App. 2006) ("Our Court will not search through briefs to discover what errors are relied on, and then search through the record for supporting evidence. It is the task of counsel to inform us, as required by our rules, both as to the specific errors relied on and the grounds and supporting facts and authorities therefor." (quoting *Mauldin v. Lowery,* 255 P.2d 976, 977 (1953))).

¶ 26    Lastly, Jason asserts that the probate court abused its discretion by impermissibly applying California law to reach its conclusions. We find no reliance on California law in the probate court's order. To the extent that Jason's argument can be understood as alleging error in the probate court's reliance on Gibson's expert testimony because that testimony was itself reliant upon California law, this argument is undeveloped and, in any event, Gibson's testimony was just one among several pieces of evidence that the probate court correctly weighed in reaching its conclusions.

### III. Undue Influence

¶ 27 Jason also contends that the probate court erred when it concluded that there was undue influence because it applied an incorrect legal standard and did not follow Colorado law. We disagree.

#### A. Standard of Review and Applicable Law

¶ 28 It is for the trial court, as trier of fact, to determine the sufficiency, probative effect, and weight of the evidence, and to assess the credibility of witnesses. *In re Estate of Romero,* 126 P.3d 228, 231 (Colo. App. 2005). We will neither reweigh witness testimony nor reevaluate the evidence. *Id.* Moreover, we view the evidence in a light most favorable to the prevailing party, and we give great deference to the fact finder's determinations. *See In re Estate of Foiles,* 2014 COA 104, ¶ 19.

¶ 29 A claim of undue influence presents a mixed question of fact and law. *See Krueger v. Ary,* 205 P.3d 1150, 1156 (Colo. 2009). Whether a presumption of undue influence applies presents a question of law, but the ultimate conclusion of whether undue influence has been established presents a question of fact. *Id.* We review a court's factual findings for clear error and its legal

15

conclusions de novo. *Sandstead-Corona v. Sandstead*, 2018 CO 26, ¶ 37. We will not upset the trial court's factual findings unless they are without substantial support in the record. *In re Estate of Ramstetter*, 2016 COA 81, ¶ 44.

¶ 30    Undue influence means words or conduct, or both, that, at the time of the making of a will, (1) deprived the testator of her free choice and (2) caused the testator to make at least part of the will differently than she otherwise would have. *See In re Estate of Everhart*, 2021 COA 63, ¶ 33; *see also* CJI-Civ. 34:14 (2024). Typically, the only evidence available to demonstrate undue influence is circumstantial in nature, from which undue influence may be inferred. *See Blackman v. Edsall*, 68 P. 790, 792 (Colo. App. 1902); *see also Eads v. Dearing*, 874 P.2d 474, 477 (Colo. App. 1993) ("Undue influence generally cannot be established by direct evidence but must be shown by the circumstances surrounding the transaction.").

### B.    Analysis

#### 1.    Rebuttable Presumption of Undue Influence

¶ 31    Much of Jason's argument centers on his assertion that the probate court erred by failing to engage in an analysis of Jordan's

16

undue influence claim required under *Krueger,* which held that if the party challenging a conveyance "can show the grantee was a fiduciary to the grantor or had a confidential relationship with the grantor, either relationship raises the rebuttable presumptions that the grantee unduly influenced the grantor and that the transaction was unfair, unjust, and unreasonable." 205 P.3d at 1154. "Once raised, these presumptions shift the burden of going forward to the party seeking to uphold the conveyance." *Id.*

¶ 32    The probate court cited *Krueger* in its written order, observing that it establishes rebuttable presumptions of undue influence and unfairness if the party challenging the conveyance "can show the grantee was a fiduciary to the grantor or had a confidential relationship with the grantor." *Id.*  Importantly, however, the court did not find that Jason's relationship with Karin met the conditions that give rise to the rebuttable presumption of undue influence that *Krueger* outlines.  Nor did it require Jason to rebut any such presumption.  To the contrary, the court rejected Jordan's claim for breach of fiduciary duty at the summary judgment stage and — even after finding in its order that Karin was "dependent on Jason

17

for her physical needs" — did not find that Jason had a confidential relationship with Karin.

¶ 33     Given the probate court's apparent conclusion that no fiduciary or confidential relationship existed, it is not entirely clear why it discussed the *Krueger* framework.  But what is clear is that the court's decision not to apply *Krueger*'s rebuttable presumption inured to Jason's benefit.  With no presumption to rebut, the court never shifted the burden to him to prove that Karin's trust was not the product of undue influence.  *See id.* at 1155-56.

¶ 34     Accordingly, because the probate court's factual findings would not have supported the application of *Krueger*'s rebuttable presumption, and because the court did not shift the burden of going forward to Jason, we discern no error.

### 2.     Evidentiary Issues

¶ 35     The remainder of Jason's arguments take issue with the probate court's findings in light of countervailing evidence that Jason presented.  For example, he contends that the fact that Karin's attorney participated in the drafting of the trust documents is, standing on its own, more or less enough to establish that she was not unduly influenced.  While we would readily concede that

18

the assistance of a disinterested attorney would reduce the likelihood that a testamentary instrument is the product of undue influence, Jason cites no authority that would permit us to reach that conclusion as a matter of law — as we would be required to do in order to discount the probate court's factual finding that Karin was unduly influenced notwithstanding the fact that she had worked with an attorney.

¶ 36　　Jason also contends that the probate court failed to follow Colorado law and relied on evidence that he asserts has no bearing on the question of undue influence, including Karin's "love and affection" for Jason, Karin's physical weakness (as opposed to her mental acuity), Karin's "dramatic change in her estate plan," and the circumstances surrounding her execution of the challenged trust documents.  While we agree that reasonable jurists could draw different inferences from these and the other facts presented at the hearing, we may not disturb the probate court's conclusions in the absence of manifest error.  *Vaccaro v. Am. Fam. Ins. Grp.*, 2012 COA 9M, ¶ 34.  And because those findings were supported by substantial evidence, we conclude that no such manifest error occurred.

## IV.    Request for Appellate Costs

¶ 37    Both parties request that this court award them their costs on appeal pursuant to C.A.R. 39(a).  C.A.R. 39(a)(2) provides that "if a judgment is affirmed, costs are taxed against the appellant." Because we affirm, we remand to the district court for a determination of appellate costs in Jordan's favor.

## V.    Disposition

¶ 38    We affirm the probate court's order and remand the case to the probate court for a determination of appellate costs.

JUDGE HARRIS and JUDGE PAWAR concur.